**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 14 2012, 9:29 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**JOSHUA D. HERSHBERGER**
Hershberger Law Firm
Madison, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**CHRISTA L. WEST**
Indiana Department of Child Services
Scottsburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

|  |  |  |
|---|---|---|
| IN RE: TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: | ) | |
| | ) | |
| K.E. & H. E., (Minor children) | ) | |
| | ) | |
| and | ) | |
| | ) | |
| D.E. (Father) & D.E. (Mother) | ) | |
| | ) | |
| (Appellants-Respondents), | ) | |
| | ) | |
| vs. | ) | No.  72A01-1107-JT-331 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE SCOTT CIRCUIT COURT
The Honorable Roger L. Duvall, Judge

**February 14, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellants-respondents D.E. (Mother) and D.E. (Father) (collectively "Parents") appeal the trial court's order terminating their parental rights with regard to their minor children, H.E and K.E. The Parents argue that there is insufficient evidence supporting the termination order. Finding the evidence sufficient, we affirm.

FACTS

Mother and Father are the parents of H.E., born April 23, 2002, and K.E., born June 24, 2004. Mother and Father have had seven children together. Initially, appellee-petitioner, Indiana Department of Child Services (DCS) became involved with the Parents in June 2006, when the Parents agreed to participate in a program of informal adjustment. The exact reason for DCS's involvement at that time is not readily apparent from the record. DCS assigned Justin Stevens as the family case manager.

In October 2006, DCS removed H.E. and her four older siblings from the Parents, and a juvenile court adjudicated the children as Children in Need of Services (CHINS) when the Parents were unable to care for the children. K.E. was not declared a CHINS at that time because she was living with a relative. DCS offered the Parents services, including family preservation, counseling, and housing.

A mental health counselor, Gerri Whitworth, was assigned to work with Mother and Father at that time. During counseling, Mother admitted to issues with depression that interfered with her ability to care for her children. Particularly, Mother was unable to get out of bed at times to care for the children. Mother refused any psychiatric intervention. Whitworth observed that Mother made some progress, but would then regress and distance herself from her children. Mother also admitted that she and Father argued a lot and those arguments occasionally resulted in domestic violence. Whitworth determined that Father had codependency issues, as Father needed to be around Mother all the time. DCS referred Father to individual counseling, but he refused.

Beginning in late 2007 to early 2008, DCS paid for the Parents to live at Providence House, a housing program that provides an apartment and reunification services. DCS then reunited K.E. and her four older siblings with the Parents. On a weekend in May 2008, the Parents requested a weekend away without the four older children. The Parents took K.E. with them, said they would return after the weekend, but never did.

Later in 2008, Mother and Father voluntarily terminated their parental rights to three of the older children, and DCS placed the oldest child in a planned permanent living arrangement. DCS then replaced K.E. with the Parents and dismissed the CHINS proceeding with regard to K.E. The Parents also regained custody of H.E.

In August 2009, the Parents took K.E. and H.E. to the Scott County Sheriff's station and asked the staff to contact the Department of Child Services (DCS) after hours,

3

on-call worker. The Parents informed the staff that they were unable to care for their children and requested that DCS place the children in foster care. Specifically, the Parents stated that they had been living in a van for over a year, and the children had had only limited amounts of food and no medical care. Therefore, at the Parents' request, DCS removed the children from their Parents' care and placed them in foster care.

While in foster care, DCS determined that the Parents had failed to enroll the children in school although both were of school age. DCS enrolled H.E. and K.E. in Kindergarten. DCS representatives observed both children had several medical problems, such as trouble breathing, head lice, severe tooth decay, and chronic constipation due to malnutrition. They were also behind on their immunizations. DCS ensured that the children received the necessary medical treatment. Specifically, one child had to have her tonsils removed, and H.E. was treated for malnutrition at Riley Children's Hospital, thereafter gaining ten pounds and growing two inches in six months. The children also received the required immunizations.

Following a hearing on August 13, 2009, the court found that there was probable cause to believe that the children were CHINS because the Parents were homeless and the children had limited food, no medical care, and no provisions for education. The court noted that Father was present at the hearing and agreed with the intervention and detention. Thereafter, DCS filed its verified CHINS petitions as to both children. The Parents admitted the allegations in the petition, and the court subsequently declared H.E. and K.E. CHINS.

4

After a hearing at which the Parents appeared with counsel, the court issued its dispositional order on October 16, 2009, adopting the DCS's predispositional report in its entirety, thereby ordering the children's continued placement in foster care and the Parents to participate in certain services. More specifically, the court ordered that: (1) [Mother] will participate in therapy twice weekly with Gerri Whitworth of LifeSpring.[1] Medications for depression will be considered; (2) [Father] will participate in therapy once weekly with Gerri Whitworth of LifeSpring in order to deal with emotional issues, specifically depression; (3) [Mother] and [Father] will participate in marriage therapy as needed; (4) [Mother] will apply for benefits that could provide a source of income for the family; and (5) [Father] will obtain employment in order to provide for the basic needs of the family, including food, clothing, and shelter.

In October 2009, the Parents obtained a rent-free apartment in Brownstown, approximately thirty minutes from where the children were placed in foster care. The apartment included a stipend to assist with utilities. Father remained unemployed and refused to seek employment. Father also suffered a heart attack that required surgery.

By January 2010, Mother and Father separated, after Mother made accusations of domestic violence. Mother moved in with her mother before Father was evicted from the apartment for, after using the stipend to pay for other expenses, failing to pay the utility bills.

---

[1] LifeSpring is a provider of mental health services in southern Indiana.

During the period of separation, Mother revealed to her counselors that she separated from Father because of physical abuse directed towards her and the children. Mother stated that she worried about Father's control and jealousy issues. Specifically, Mother said that Father would not allow her to go anywhere−including the bathroom−by herself, and when she tried to go down stairs on one of the days before she left, Father grabbed her and injured her wrist. Mother also expressed concerns about Father sexually abusing the children because of alleged incidents in the past.

DCS referred Father to anger management classes as a result of Mother's assertions. Father attended only one class.

Mother reconciled and reunited with Father at the end of January 2010. Tom Trent, a social worker and one of Mother's counselors, determined that Mother exhibited symptoms of post-traumatic stress disorder. He stated that Mother did not meet any of the goals that the two of them developed for her therapy. In particular, he noted that Mother reunited with Father despite his failure to attend anger management classes. And, in March 2010, the Parents separated again.

The Parents visited with the children when the children were placed in foster care, but Mother failed to make more appointments than Father. DCS would have to schedule some of the visitations separately during the periods the Parents were separated. The court-appointed special advocate (CASA) for the children observed that the Parents would interact with the children individually but not as a family.

6

In May 2010, DCS ordered that services end because the Parents had failed to show any real progress. Father obtained full-time employment between May and July 2010. Shortly before or after DCS filed the termination petitions, Mother and Father obtained housing described as "living in a building owned by a church." Tr. p. 51.

On July 22, 2010, DCS filed petitions for the involuntary termination of the parent-child relationship. On August 5, 2010, the court held an initial hearing on the petitions where the Parents appeared and denied the petitions, and legal counsel for the Parents was appointed. After several continuances, the court held three evidentiary hearings over February and March 2011. Both the CASA and family case manager testified the termination was in the best interests of H.E. and K.E. At the final hearing, the Parents failed to appear.

On June 22, 2011, the trial court entered its findings of facts and conclusions of law terminating Mother's and Father's relationship with both H.E. and K.E. Mother and Father now appeal.

DECISION AND DISCUSSION

I. Standard of Review

When reviewing a trial court's decision to terminate a parent-child relationship, we neither reweigh the evidence nor judge the credibility of witnesses, and we will consider only the evidence that supports the trial court's decision and the reasonable inferences that may be drawn therefrom. Id. Moreover, in deference to the trial court's

7

unique position, we will not set aside the trial court's judgment unless it is clearly erroneous. In re A.A.C, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997).

Here, in terminating Mother and Father's parental rights, the trial court entered specific findings of fact and conclusions, and, therefore, we apply a two-tiered standard of review. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. "Findings are clearly erroneous only when the record contains no facts to support directly or by inference." Quillen v. Quillen, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and the inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999).

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996). But, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. In re K.S., 750 N.E.2d 832, 837 (Ind. Ct. App. 2001). Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

8

To effect the involuntary termination of a parent-child relationship, the State must, in pertinent part, present clear and convincing evidence establishing that:

> (B) there is a reasonable probability that:
> > (i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
> > (ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
> (C) termination is in the best interests of the child; and
> (D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

As set forth above, subsection (B) is written in the disjunctive, requiring that the DCS prove one of the three conditions by clear and convincing evidence. In re L.S., 717 N.E.2d 204, 209 (Ind. Ct. App. 1999). Therefore, standing alone, a finding that a reasonable probability existed that the conditions resulting in the removal of the child were unlikely to be remedied by the parent, can satisfy the requirement listed in subsection (B).

## II. Conditions Remedied

The Parents argue that DCS failed to show that the conditions that resulted in H.E.'s and K.E.'s removal or placement outside of the home would not be remedied. Specifically, Mother and Father contend that they have remedied the reasons for the children's removal because they can now provide proper housing and food for their children. They also challenge the evidence supporting allegations of Father's domestic and sexual abuse, contend that Father's lack of participation in services was caused by his

9

lack of transportation, and that Mother's mental health issues were not the sole or proximate cause of her parenting deficiencies.

When determining whether certain conditions that led to the removal of the children will be remedied, the trial court must judge the parent's fitness to care for the children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re D.J., 755 N.E.2d 679, 684 (Ind. Ct. App. 2001). A parent's habitual pattern of conduct must also be evaluated to determine the probability of future negative behavior. Id. Pursuant to this rule, courts have properly considered evidence of a parent's history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002). As well, the trial court can properly consider the services the State offered to the parent and the parent's response to those services. In re M.W., 943 N.E.2d. 848, 854 (Ind. Ct. App. 2011).

As discussed above, DCS most recently became involved with both H.E. and K.E. when the Parents, on their own accord, turned the children over to DCS because the Parents were unable to provide for the well-being of the children. At that time, the Parents were homeless, failed to enroll the children in school, and were unable to provide the children with enough food or any medical or dental care. As a result, the children were malnourished and behind in their education. The children also exhibited severe behavioral problems, such as being physically abusive towards adults. Tr. p. 119.

10

In determining that there is a reasonable probability that the conditions leading to H.E. and K.E.'s removal would not be remedied, the trial court made numerous findings regarding Parents' domestic problems and mental health issues that have long affected their ability to parent and provide for their children. Specifically, the trial court noted the Parents' lengthy history with the DCS preceding this case "for reasons similar to the current circumstances that cause the Court and DCS involvement" and their voluntary termination of their relationship with three of their other children and the permanent placement of another. Appellant's App. p. 9.

Moreover, contrary to the Parents' argument that they have remedied the conditions that led to the children's removal, it is apparent from the trial court findings that it considered the Parents' domestic and mental health issues to be root causes of the Parents' neglect of their children. The trial court also found that the Parents failed to respond to services intended to address those root issues. The trial court specifically found:

17. The evidence is such that there has not been significant improvement of the parent's ability to care for these children. The Court acknowledges that the parents have been fairly regular in their visitation with the children and have received some services. . . . The visits were appropriate however the observations were that Mother was passive and not actively involved with the children. The Father was more engaged in the visits. These visits and services took place in the context of continued domestic violence issues and Mother's mental health issues. There were allegations of domestic violence in March 2010 which resulted in a period of separation. There had also been allegations in the previous year prior to DCS involvement of domestic violence. The Mother indicated a history of physical and emotional abuse and marital infidelity on the part of Father. The Mother

11

also indicated a concern about leaving the children alone in the past due to allegations that in the past the Father sexually abused other children.

18. The Mother's mental health issues include depression, anxiety, and an eating disorder. The Mother refused to release her record and failed to submit to an evaluation. The Mother has been resistant to the use of therapeutic drugs to address the mental health issues. Counselors and mental health professionals were consistent in their testimony that the Mother would display some progress but would then regress. Also in the mental health area a codependency relationship between the Father and the Mother was observed. Father displayed an obsession with the Mother that took priority over the efforts to correct circumstances that led to the removal of the children.

19. The parents have displayed a basic inability to process the services or apply service to the care of the children. The evidence is clear that the offered services were not working through no fault of the services providers.

Appellant's App. p. 10.

We are convinced that the record includes sufficient evidence to support these findings. The family case manager and two of Mother's therapists testified as to Mother's debilitating depression and her inability to improve following her participation in the services that were offered. Tr. p. 65, 109-13, 157-62. Specifically, Mother's mental health issues caused her to either remain in bed or not leave the house, interfering with her ability to provide for her children. Id. at 123-24. Mother had been in and out of counseling for her mental health issues since 2006. Id. at 100-11. Whitworth testified that although Mother showed signs of progress at times, she ultimately regressed, became more depressed, and distanced herself from her children. Id. at 113. Mother's other therapist, Tom Trent, agreed, concluding that Mother did not meet the goals she set for

12

herself in that she reconciled with Father, despite her continued worries about his anger issues. Id. at 10.

The trial court heard testimony from the family case manager and therapists about the Parents' marital discord and Father's inability to process services to address his anger issues. Both before and after the Parents turned H.E. and K.E. to the DCS, Mother complained to her therapists of Father's domestic violence and abuse toward the children. Tr. p. 53-54, 113. In one instance, Mother spoke of an incident where Father was "going after" the children, and when Mother intervened, Father struck her. Id. at 55. More recently, she told her therapists, that just before their separation in January 2010, Father grabbed Mother by the wrist as she attempted to leave the house, injuring her. Id. at. 54. Mother also told her therapist that Father was controlling and had jealousy issues. Id. at 113.

Father also failed to show a benefit from services. Father only participated in one class intended to address his anger issues and the allegations of domestic violence. Id. at 88.

The record also reveals that the Parents have failed to show an ability to provide housing and basic care for their children. Mother and Father have twice separated. Id. at 50, 178, 196. Their first separation resulted in them having to leave rent free housing intended to promote reunification with the children. Id. at 50. Neither parent has held employment or housing for a significant amount of time. Only around the time of the

13

filing of the petition for termination and after services were stopped did Father secure employment. Id. at 92.

In short, the circumstances here, including the Parents' failure to show progress in the court-ordered services, supports the trial court's conclusion that there is a reasonable probability that Mother and Father will not remedy the conditions that resulted in the children's removal.

### III. H.E.'s and K.E's Best Interests

We next consider Father's and Mother's assertions that DCS failed to prove that termination of their parent-child relationships with H.E and K.E. is not in the children's best interests. When determining what is in a child's best interests, a trial court is required to look beyond the factors identified by the DCS and to look to the totality of the evidence. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, however, the court must subordinate the interests of the parent to those of the child. Id. A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. In re E.S., 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002). Moreover, we have previously explained that recommendations from the family case manager and CASA that parental rights should be terminated support a finding that termination is in the child's best interests. Id.

Here, as noted above, the evidence supports the trial court's findings that Mother continues to suffer from mental health problems and Father has issues with anger that

14

have resulted in alleged instances of domestic violence. Moreover, the evidence established that the Parents failed to sustain employment or housing that would allow them to care for the children. Both the family case manager and CASA testified the H.E and K.E. are doing well together in their foster home and that terminating the parent-child relationship is in the best interest of the children. Id. at 70, 225.

The testimony from the family case manager and CASA recommending termination of the parent-child relationships, coupled with Father's anger and control issues, Mother's unresolved mental health issues and both Parents' failure to benefit from the services provided, leads us to the conclusion that the trial court's determination that termination of Father's and Mother's parental rights is in H.E.'s and K.E's best interests is supported by the evidence. See In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony from the CASA and family case manager regarding the child's need for permanency and recommendation to terminate parental rights, combined with evidence that conditions causing removal will not be remedied, constitutes sufficient evidence to support termination of parental rights).

The judgment of the trial court is affirmed.

DARDEN, J., and BAILEY, J., concur.

15