**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Mar 16 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**MICHAEL J. KYLE**
Baldwin Adams Knierim & Kamish, P.C.

ATTORNEYS FOR APPELLEE:

**ELIZABETH A. GAMBOA**
Indiana Department of Child Services
Franklin, Indiana

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| R.F. and I.A., | ) | |
| | ) | |
| Appellants-Respondents, | ) | |
| | ) | |
| vs. | ) | No. 41A05-1107-JT-376 |
| | ) | |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE JOHNSON CIRCUIT COURT
The Honorable K. Mark Lloyd, Judge
Cause Nos. 41C01-1101-JT-1, 41C01-1101-JT-2, 41C01-1101-JT-3,
41C01-1101-JT-4, 41C01-1101-JT-5 and 41C01-1101-JT-6

**March 16, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

R.F. ("Mother") and I.A ("Father") appeal the involuntary termination of their parental rights to their children, claiming there is insufficient evidence supporting the trial court's judgment. We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological mother of N.F., J.W., C.W., M.F., I.F., and A.F. Father is the biological father of N.F. and A.F.[1] The facts most favorable to the trial court's judgment reveal that in December 2008, the Johnson County office of the Indiana Department of Child Services ("JCDCS") took all the children, except A.F. who was not yet born, into emergency protective custody. At the time, six-week-old N.F. had been taken to Community South Hospital for a fever when hospital personnel discovered the infant was suffering with severe, life-threatening injuries. The child was transported to Riley Hospital in Indianapolis where further testing confirmed that the "left side of [N.F.'s] brain was infracted with overlying subdural hematoma." Appellant's App. at 3. Moreover, the presence of "new blood" demonstrated that the subdural hematoma was a recent injury. Id. An abdominal CT scan further revealed that N.F. was also suffering with numerous rib fractures that were at least ten days old, including right rib fractures to posterior ribs 4-8 and lateral ribs 3-7 as well as left rib fractures to posterior ribs 4-8 and lateral ribs 6-9. Additional injuries included fractures to both distal tibias and corner

---

[1] R.W. is the biological father of J.W. and C.W. R.W. appeared at the initial hearing on the termination petition, and the trial court granted R.W.'s request to continue the termination proceedings as to R.W. and his two children (J.W. and C.W.). J.J. is the biological father of M.F. G.A. is the biological father of I.F. None of these fathers participate in this appeal. Consequently, we shall limit our recitation of the facts to those pertinent solely to Father's appeal of the involuntary termination of his parental rights to N.F. and A.F., as well as to those facts pertinent to Mother's appeal of the involuntary termination of her parental rights to all six children.

fractures, a distal radius torus fracture in the right forearm, and a first metatarsal fracture in the right foot, totaling of approximately twenty-one injuries since birth. The next day, N.F. stopped breathing, was placed on a ventilator, and was transferred to Riley Hospital's Intensive Care Unit.

During its investigation of the matter, a JCDCS assessment case worker spoke with Mother and Father. Neither parent was able to provide an explanation as to how N.F. sustained what experts described as "non-accidental" injuries. Transcript at 576. In addition, while at the hospital both parents repeatedly informed police detectives and hospital personnel that no one ever "holds" or "watches" N.F. except for the parents. Id. at 4. Within days of removing the children from the family home and placing them in foster care, JCDCS filed petitions under separate cause numbers alleging N.F., J.W., C.W., M.F., and I.F. were children in need of services ("CHINS"). In March 2009, the children were adjudicated CHINS.

Following a dispositional hearing in April 2009, the trial court entered an order formally removing the children from Mother's and Father's care and adjudicating the children wards of JCDCS. The court's dispositional order further directed both parents to participate in and successfully complete a variety of tasks and services designed to improve their parenting abilities and to facilitate reunification with the children. Specifically, the parents were ordered to, among other things: (1) maintain safe, stable, and sanitary housing with functioning utilities and an adequate supply of nutritious food; (2) successfully participate in and complete home-based counseling services including parenting education classes; (3) meet all of the children's medical and mental health

needs in a timely and complete manner, attend all of the children's doctors' appointments, and administer all medications as prescribed; (4) participate in all scheduled supervised visits with the children and avoid using any physical discipline during visits; (5) establish paternity of the children; and (6) refrain from using alcohol or illegal drugs and prohibit any such use from occurring in the family home.

Following the dispositional hearing, both parents began participating in court-ordered reunifications services. Their participation, however, was inconsistent and ultimately unsuccessful. The parents moved from Greenwood to the west side of Indianapolis in January 2010. The children, however, remained wards in Johnson County. In February 2010, A.F. was born in Marion County. Because of the open CHINS cases pertaining to A.F.'s five older siblings in Johnson County and both parents' lack of progress in reunification services, A.F. was taken into immediate protective custody by the local Marion County office of IDCS upon the child's birth.

Several days later, a detention hearing was held in Marion County. The Marion County Superior Court ordered A.F.'s continued detention and then transferred A.F.'s case to Johnson County to be consolidated with the ongoing CHINS cases relating to A.F.'s siblings. In July 2009, both Mother and Father admitted to the allegations of the CHINS petition pertaining to A.F., and the child was so adjudicated. The trial court proceeded to disposition the same day, and both parents agreed that the court's previous dispositional orders entered in A.F.'s siblings' CHINS cases should also be incorporated into A.F.'s case.

Mother and Father continued to sporadically engage in services. Neither parent, however, was ever able to maintain his or her progress in their ability to provide the children with a safe and stable home environment. For example, Mother exercised regular visitation with the children, submitted to a psychological assessment, and completed two parenting education programs. Nevertheless, Mother was unable to successfully implement the new parenting techniques that she had learned while visiting with the children. She also failed to demonstrate consistency in setting boundaries for the children and/or disciplining the children, oftentimes yelled during visits, and continued to resist all suggestions from visit supervisors. As a result, visits continued to be chaotic and stressful for the children, and although Mother achieved periodic increases in parenting time including some overnight visits, visitation privileges always reverted back to supervised visits. Mother also regularly missed and/or was late for the children's scheduled doctors' appointments, consistently denied any responsibility for N.A.'s injuries, and was generally hostile and uncooperative toward every service provider involved with the family.

Although Father was generally more cooperative with service providers and affectionate toward all the children, he oftentimes failed to attend scheduled visits and/or home-based counseling appointments. Father also tested positive for marijuana. He thereafter completed an intensive outpatient drug treatment program ("IOP") in November 2010, but then tested positive for cocaine the next month. Father began a second IOP, but failed to complete the program by the time of the termination hearing. In addition, Father failed to establish legal paternity of N.F. and A.F., refused to intervene

5

when Mother acted inappropriately during visits with the children, and never indicated that he was willing to care for the children on his own should Mother's parental rights be terminated.

Meanwhile, JCDCS filed petitions seeking the involuntary termination of Mother's and Father's parental rights to their respective children in January 2011. A four-day evidentiary hearing took place during the months of May and June, 2011. During the termination hearing, JCDCS presented substantial evidence concerning both parents' failure to successfully complete and/or benefit from a majority of the trial court's dispositional orders, including achieving employment, successfully completing home-based counseling services, incorporating newly learned parenting techniques into their daily lives, demonstrating they are capable of providing for the children's medical and emotional medical needs, and maintaining a safe and stable home environment. CCDCS also presented evidence regarding Father's unresolved substance abuse issues, failure to establish paternity of N.F. and A.F., and history of criminal activities including a prior conviction for possession of marijuana in the State of Illinois, as well as new, pending charges for check deception and Class C felony burglary.

Regarding the children, CCDCS presented evidence establishing that J.W., C.W., M.F., and I.F. were placed together in pre-adoptive foster care. A.F. and N.F. were likewise living together in a second, pre-adoptive foster home. All the children remained bonded to one another, and their respective care-givers, who had a good working relationship, allowed the children to visit one another on a regular basis. In addition,

evidence submitted by JCDCS established that J.W. and C.W. had both expressed a desire to remain in their current foster home and not be returned to their parents.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On July 12, 2011, the trial court entered its judgment terminating Mother's parental rights to all six children and terminating Father's parental rights to N.F. and A.F. Both parents now appeal.

## DISCUSSION AND DECISION

We begin our review by acknowledging that when reviewing a termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. In re D.D., 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), trans. denied. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. K.S., 750 N.E.2d at 837. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. Id. Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be

7

terminated when a parent is unable or unwilling to meet his or her parental responsibilities. Id. at 836.

Before an involuntary termination of parental rights can occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

Ind. Code § 31-35-2-4(b)(2)(B) (2010). The State's "burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Moreover, Indiana Code section 31-35-2-8(a) provides that if a trial court finds that the allegations in the termination petition to be true, the court shall terminate parental rights.

Mother's and Father's sole allegation of error on appeal is that JCDCS failed to prove, by clear and convincing evidence, the requirements of subsection (b)(2)(B) of Indiana's termination statute cited above. See Ind. Code § 31-35-1-4(b). In so doing, neither parent purports that any particular finding made by the trial court is unsupported by the evidence. Rather, Mother and Father simply assert they are entitled to reversal because "[g]iven the significant progress the parents made, the statutory elements for termination have not been proven by clear and convincing evidence." Appellant's Brief at 8.

8

We begin our review by observing that Indiana's termination statute requires JCDCS to establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before terminate of parental rights may occur. Because we find it to be dispositive under the facts of this particular case, we shall only consider whether clear and convincing evidence supports the trial court's determination that there is a reasonable probability the conditions resulting in the children's removal or continued placement outside the family home will be remedied. See Ind. Code § 31-35-2-4(b)(2)(B)(i).

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied. The trial court may also consider any services offered to the parent by the local Indiana Department of Child Services office (here, JCDCS) and a parent's response to those services, as evidence of whether conditions will be remedied. Id. Moreover, JCDCS is not required to provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. In re Kay L., 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

9

In the present case, the trial court's judgment contains ninety-two detailed findings regarding Mother's and Father's unresolved parenting issues. In addition to describing the specific circumstances surrounding N.F.'s "severe, non-accidental, life-threatening injuries" which occurred while N.F. was in the family home and under the constant care and supervision of Mother and Father, the court also detailed both parents' failure to benefit from the wealth of reunification services available to them for approximately two-and-one-half years. Appellant's App. at 2. For example, although the trial court acknowledged that Mother and Father had maintained housing, were able to provide the children with "adequate" food during supervised visits, and "reported having various jobs throughout the proceedings," the court went on to observe that Mother never provided "[JCDCS] or the service providers with proof of income" and that Father's only proof of employment was "a copy of a check indicating the number of hours worked." Id. at 5-6.

The trial court also found that Mother and Father "did not meet all the children's medical and mental health needs," emphasizing N.A.'s significant on-going medical conditions as a result of the injuries she suffered as an infant, including her diagnosis of hemiplegic cerebral palsy and use of a G-tube to ensure proper nutrition. Id. at 6. Specifically, the court noted that throughout the underlying proceedings, Mother refused to follow all of the directions of the doctors and nurses in feeding, medicating, and caring for N.A. Additionally, the court found that both parents had repeatedly failed to attend scheduled doctor's visits for all of the children.

Regarding Mother's and Father's participation in a home-based counseling program, the trial court found that Mother and Father "did not accomplish this goal." Id.

10

at 7. The court further explained that Mother continued to "project blame on others for [N.J.'s] injuries," and did not "respond well" to the service providers who "attempted to help her improve her parenting skills" due to her "oppositional posture." Id. As for Father, the trial court found Father had not completed a parenting education program, "was not always in attendance at the home-based appointments and the visits," and failed to "demonstrate[]" and/or "verbally indicate[]" a willingness or ability to parent his children independent of [Mother]." Id.

The court ultimately determined that although "the parents have accomplished some of the goals, the parents have made very little progress on the most significant goals." Id. at 5. In so doing, the trial court concluded as follows:

> There is a reasonable probability the conditions that resulted in [the children's] removal will not be remedied. . . . In summary, the children were removed due to the extensive injuries to [N.F.] as well as the failure by the parents to provide the children with a safe environment. Both [Mother] and [Father] have been provided with extensive parenting education and extensive family support services to assist them in providing a safe environment for their children. The parents have not demonstrated they are able to provide the children with a safe home environment on any sustained basis. In addition, [Mother] continues to deny personal responsibility for [N.A.'s] injuries or the [family's] circumstances, despite the overwhelming evidence - as well as a finding of this court - to the contrary. The Court finds it is therefore unlikely the conditions that resulted in the children's removal will be remedied.

Id. at 17-18. A thorough review of the record leaves us satisfied that abundant evidence supports the trial court's findings and conclusions cited above, which in turn support the court's ultimate decision to terminate both Mother's and Father's parental rights to their respective children.

11

The record makes clear that at the time of the termination hearing, Mother and Father had made little, if any, progress in their ability to provide the children with a safe and stable home environment. Specifically, both parents' employment status remained unknown, neither parent had successfully completed home-based counseling services, and neither parent was able to demonstrate an ability to consistently use appropriate boundary setting and discipline techniques with the children. Additionally, Father had failed to establish paternity of N.F. and A.F., continued to struggle with substance abuse issues, and was facing new criminal charges.

Also significant, it was the general consensus among case workers and service providers that Mother's and Father's circumstances and abilities to safely care for and parent the children would likely never improve. During the termination hearing, Dr. Alfred Barrow informed the court that he had conducted the psychological evaluations on both parents. Dr. Barrow further testified that his assessment of Mother's general personality function suggests there is a possibility she suffers from a personality disorder and that she may have "difficulty managing her anger effectively," especially in light of the circumstances surrounding N.F.'s injuries. Transcript at 19. When asked his opinion concerning Mother's "ability to change," Dr. Barrows stated that, given the psychological test data, his clinical observations, and Mother's social history, Mother's prognosis for "significant change in personality functioning and parenting effectiveness would appear to be poor to guarded." Id. at 19-20. As for Father, Dr. Barrow reported that Father's test results reflected almost identical levels of "defensiveness" as was the case with Mother. Id. at 24. Dr. Barrow further testified that Father's test results were consistent

with individuals who experience moderate levels of depression, and that his prognosis for change was slightly better than Mother's, but nevertheless remained "guarded at best." Id. at 24, 27.

Home-based counselor Lindsey Borns reported that during the time that she provided services to the family, Mother never took responsibility for the injuries sustained by N.F. Borns also testified that Mother would sometimes be argumentative and defensive during counseling sessions, and that although Mother and Father seemed to understand the parenting techniques that were taught as part of the parenting curriculum, both parents "struggled with implementing those skills" and were "weak on setting boundaries and implementing consequences." Id. at 146-47, 158. Home-based counselor Katherine Comstock likewise confirmed that both parents were inconsistent in their "level of engagement" in home-based counseling services and goals, stating Father would oftentimes miss scheduled appointments to go to work and Mother would spend a lot of time "refus[ing]" recommendations and "blam[ing]" others for her lack of progress. Id. at 316. When asked to describe her general observations of the supervised home visits that had just recently occurred in April 2011, Comstock described the visits as "[v]ery chaotic" and further indicated there was a "lack of direction of any kind of behavior" by the parents. Id. at 329.

Finally, in recommending termination of Mother's and Father's parental rights, JCDCS case manger Deborah Chattin informed the trial court that both parents had failed to demonstrate the positive changes necessary to safely and appropriately parent the children. Chattin further testified that the "common thread" throughout the visitation

13

logs continued to be "a lot of yelling and screaming in the home," Father never consistently participated in services, and Mother's participation, although consistent, was best described as "extremely resistant" and "defiant." Id. at 606, 612.

As noted earlier, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. D.D., 804 N.E.2d at 266. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing services, in conjunction with unchanged conditions, supports a finding that there exists no reasonable probability that the conditions will change." Lang v. Starke Cnty. Office of Family & Children, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), trans. denied. Moreover, we have previously explained that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change." In re J.S., 906 N.E.2d 226, 234 (Ind. Ct. App. 2009). Based on the foregoing, we conclude that clear and convincing evidence supports the trial court's findings as well as its ultimate determination to terminate Mother's and Father's parental rights. We therefore find no error.

Affirmed.

ROBB, C.J., and VAIDIK, J., concur.