**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**




ATTORNEY FOR APPELLANT:
**R. PATRICK MAGRATH**
Alcorn Goering & Sage, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE:
**MARJORIE A. MILLMAN**
DCS, Jackson County Local Office
Seymour, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP OF: D.C.; M.C.; M.G.; & L.C. (Minor Children) and T.G. (mother),
Appellant-Respondent,

vs.

THE INDIANA DEPARTMENT OF CHILD SERVICES,
Appellee-Petitioner.

No. 36A01-1204-JT-150

APPEAL FROM THE JACKSON SUPERIOR COURT
The Honorable Bruce A. MacTavish, Judge
Cause No. 36D02-1112-JT-309, 310, 311, 312

**October 25, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

T.G. ("Mother") appeals an order terminating her parental rights to D.C., M.C., M.G., and L.C. (collectively, "the Children") upon the petition of the Jackson County Department of Child Services ("DCS").[1] We affirm.

## Issue

Mother presents a single issue for review: Whether DCS established, by clear and convincing evidence, the requisite statutory elements to support the termination of parental rights.

## Facts and Procedural History

In January of 2011, DCS received a report that Mother was neglecting the medical needs of her youngest child, M.C., who had been born prematurely and had chronic lung disease. Family case manager Lissa Allman ("Allman") investigated the report and determined that M.C. had been released from the hospital in August of 2010, with referrals to four specialists. By January, M.C. had not been seen by any specialist; his medication and respiratory injections were not being administered and, at times, he was without access to his bottled oxygen.

Allman also determined that the Children lacked adequate food and clothing, and that the family was in imminent danger of eviction. Mother's four children and infant grandchild

[1] The parental rights of two named fathers and one unknown father were also terminated. Although the fathers are parties of record, they are not active participants in this appeal.

were removed from the home.[2] M.C. was soon hospitalized for a severe lung infection; he was "life lined" from Columbus Regional Hospital and spent three and one-half weeks in an Indianapolis pediatric facility. (Tr. 82.) Mother was charged with and pled guilty to one count of Neglect of a Dependent, as a Class A misdemeanor,[3] for failing to provide M.C. with appropriate medical care. Mother received a one-year sentence, suspended to probation.

On February 2, 2011, the Children were determined to be Children in Need of Services. At the disposition hearing, Mother was ordered to participate in individual counseling, contact DCS on a weekly basis, complete a substance abuse assessment and follow recommendations, submit to random drug tests, maintain a stable home, obtain reliable transportation and seek full-time employment, become educated regarding M.C.'s special needs care, make medical appointments for the Children, complete parenting classes, and visit with the Children.

Mother's participation in reunification services was inconsistent. She regularly visited with the Children and maintained sporadic contact with DCS. However, she did not participate in a substance abuse assessment. On three occasions, she refused to submit to drug screens. On several other occasions, she tested positive for substances including methamphetamine, oxycodone, and oxymorphone. She attended seven individual counseling appointments, but failed to show up for twenty-five appointments. Mother appeared for three of M.C.'s medical appointments, but did not obtain training related to his gastric tube.

---

[2] M.G. had become pregnant at age thirteen and had recently given birth. The seven-week-old had not received her recommended immunizations and M.G. had not had her post-natal checkup.

[3] Ind. Code § 35-46-1-4.

On August 3, 2011, Mother appeared at a periodic review hearing in the custody of law enforcement. She had been arrested for welfare fraud for having retained M.C.'s Supplemental Security Income checks after the removal.

On December 8, 2011, DCS petitioned to terminate Mother's parental rights. The Jackson County Superior Court, Juvenile Division, conducted an evidentiary hearing on March 7, 2012. On March 10, 2012, the court issued an order terminating Mother's parental rights. She now appeals.

## Discussion and Decision

### A. Standard of Review

Our standard of review is highly deferential in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Id.

### B. Requirements for Involuntary Termination of Parental Rights

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147

(Ind. 2005). The purpose of terminating parental rights is not to punish the parents, but to protect their children. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Indiana Code Section 31-35-2-4(b)(2) sets out the elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) That one (1) of the following is true:

> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
> (ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.
> (iii) The child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) That one (1) of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described above are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A trial

court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied.

C. Analysis

Mother does not challenge the juvenile court's determination pursuant to Indiana Code Section 31-35-2-4(b)(2)(A) (removal from parent), (C) (best interests of the children) or (D) (satisfactory plan). She challenges the determination relating to Indiana Code Section 31-35-2-4(b)(2)(B) (conditions will not be remedied or relationship poses a threat to child's well-being).

Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, and therefore the court needed only to find that one of the three requirements of subsection (b)(2)(B) had been established by clear and convincing evidence. See L.S., 717 N.E.2d at 209. As Mother observes, the trial court did not specifically conclude that there exists a "reasonable probability" the conditions leading to removal "will not" be remedied, instead finding that "[t]he reasons for the removal or reasons for placement outside of the home have not been

remedied." (App. 19.) (emphasis added.) However, the court specifically found that continuation of the parent-child relationships posed a threat to the well-being of the Children. Accordingly, we will consider whether DCS established, by clear and convincing evidence, the existence of such a threat. See Ind. Code § 31-35-2-4(b)(2)(B)(ii).[4]

Mother admits that she "did not comply with all aspects of the case plan or participate in all offered services" but alternatively suggests that she will be able to complete the services, or effectively parent without the services. Appellant's Brief at 14-15. She argues that her lack of progression as measured by DCS expectations is not a threat to the Children's well-being.

Family case manager Mary Ann Spray ("Spray") testified that Mother had failed to attend sufficient individual therapy appointments to progress toward the anticipated family counseling with her two oldest children, and did not complete a formal substance abuse assessment. Spray explained that L.C. had been diagnosed with Attention Deficit – Hyperactivity Disorder. She described D.C. as "a wild child" with severe tantrums, head banging, poor speech development, and defiance, although he had made progress in foster care. (Tr. 90.) She opined that M.G.'s needs, as a young teen mother, were "extreme." (Tr. 95.) According to Spray, Mother had signed up for two sessions of parenting classes, but failed to complete either session.

---

[4] The DCS notes that the trial court concluded "DCS has proven by clear and convincing evidence that the allegations in the petition are true." (App. 20.) Nonetheless, the DCS allegation was written in the disjunctive, alleging either that the conditions leading to removal were unlikely to be remedied or that continuation of the parent-child relationships posed a threat to the Children's well-being. Thus, we cannot determine, on the basis of the petitions for termination and orders, that the trial court entered a conclusion of law with respect to likelihood of conditions being remedied.

Spray detailed Mother's drug screens as follows. In January of 2011, Mother refused a drug test. She again refused a test in early February. On February 9, 2011, Mother tested positive for amphetamines and methamphetamines. On February 24, 2011, she tested positive for methamphetamines. In early March, she tested positive for oxycodone; later that month, she refused a drug screen. On March 23, 2011, she tested positive for methamphetamines. Twice in June and twice in July, she tested positive for oxycodone and oxymorphone. In September, Mother was observed touching a swab as if to alter the test results; she was given a second test and that test was positive for oxycodone and oxymorphone. Those tests had been administered when Mother appeared for visitation with the Children; Mother was not cooperative with random drug testing at her home because she would not appear at agreed-upon times. Despite the positive drug screens, Mother did not pursue substance abuse evaluation and treatment.

Lacking full-time employment, she did not provide financial support while the Children were in foster care. Mother and her boyfriend had obtained housing approximately one year prior to the termination hearing. The property belonged to the boyfriend's mother, who allowed the occupancy although Mother and her boyfriend were not paying rent and did not have a rental or purchase contract. Spray described the initial condition of the residence as "very dilapidated" and needing an "extreme amount of work, both inside and outside." (Tr. 58.) Spray testified that the couple had made substantial progress in renovating the residence, but it was "not suitable to put these children back in." (Tr. 59.) In particular, Spray had concerns with regard to mold, missing windows, uncovered insulation, gaps in the

drywall, exposed electrical wiring, displacement of foundational bricks, plywood on the porch, and a lack of electricity in one of the bedrooms. The utility bills were delinquent, with the gas company threatening disconnection.

Spray testified that Mother did not appreciate the complexity of the Children's issues and, in particular, had "minimized" M.C.'s medical needs. (Tr. 78.) She appeared unable to appropriately respond to alarms from M.C.'s heart monitor and did not seek out instruction with regard to the gastric tube or nebulizers.

The Court Appointed Special Advocate ("CASA") testified that, in her opinion, Mother was unable to provide the Children with a stable, safe, drug-free home. More specifically, the CASA testified that Mother "has pretty much flat out refused to complete any of [the case plan] things" and thus never received the therapy directed toward substance abuse. (Tr. 43-44.) The CASA also opined that Mother did not consider either M.C.'s health or the Children's education to be a priority. Ultimately, the CASA believed that termination of parental rights was in the Children's best interests.

There is ample evidence that Mother has historically been unable to provide for the Children's physical and psychological needs. As of the termination hearing, she lacked suitable housing, full-time work, or training with regard to M.C.'s special medical needs. Despite her refused and failed drug screens, and the lack of substance abuse evaluation and treatment, Mother insists that she has been drug free for three months and that this is predictive of her future stability. She points to testimony that she has made progress in her employment and her home renovation. In essence, Mother asks that we reweigh the evidence

and accord greater weight to her testimony of her recent efforts and future aspirations. We will not do so. See In re A.A.C., 682 N.E.2d at 544.

DCS presented clear and convincing evidence from which the trial court could conclude that the continuation of the parent/child relationships posed a threat to the Children.

## Conclusion

DCS established by clear and convincing evidence the requisite elements to support the termination of parental rights.

Affirmed.

RILEY, J., and CRONE, J., concur.