**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Nov 29 2012, 8:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ELDEN E. STOOPS, JR.**
Law Offices of Elden E. Stoops, Jr., P.C.
North Manchester, Indiana

ATTORNEYS FOR APPELLEE:

**TODD A. WHITEHURST**
DCS Local Office in Wabash County
Wabash, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN RE THE TERMINATION OF THE          )
PARENT-CHILD RELATIONSHIP OF:         )
M.M. (Minor Child),                   )
                                      )
and                                   )
                                      )
S.H. (Mother),                        )
                                      )
    Appellant-Respondent,            )
                                      )
      vs.                          )    No. 85A02-1204-JT-323
                                      )
THE INDIANA DEPARTMENT OF             )
CHILD SERVICES,                       )
                                      )
    Appellee-Petitioner.             )
                                      )

APPEAL FROM THE WABASH CIRCUIT COURT
The Honorable Robert R. McCallen III, Judge
Cause No. 85C01-1106-JT-15

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

S.H. ("Mother") appeals the involuntary termination of her parental rights to her child, M.M. Concluding that the Indiana Department of Child Services, local office in Wabash County ("WCDCS"), presented clear and convincing evidence to support the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of M.M., born in January 2001. M.M.'s biological father, B.M., is deceased. The facts most favorable to the trial court's judgment reveal that sometime following the death of M.M.'s father, Mother married and began living with T.M. ("Stepfather"), along with M.M. and M.M.'s two older siblings. In November 2009, the local Wabash County office of the Indiana Department of Child Services ("WCDCS") received a report that M.M. had stated during a "safety-body program" at school that Stepfather had been molesting her for the past several years. Appellee's App. p. 1. That same day, a WCDCS caseworker accompanied local police personnel, Mother, and M.M. to the Child Advocacy Center in Marion, Indiana, where M.M. was interviewed. During the interview, M.M. told detectives that Stepfather had

molested her "orally, vaginally, and in the anus on and off for the past 4 years" since M.M. was "three or four" years old. *Id.* at 2.[1]

Following the interview with M.M., WCDCS took the child into emergency protective custody and filed a petition alleging M.M. was a child in need of services ("CHINS").[2] A fact-finding hearing on the CHINS petition was eventually held in May 2010, and M.M. was so adjudicated.[3] Later the same month, the trial court issued a dispositional order formally removing M.M. from Mother's care and custody and making the child a ward of WCDCS. The court's dispositional order further directed Mother to successfully complete several tasks and services designed to facilitate reunification with M.M., including individual and family counseling, home-based case management services, and supervised visitation with M.M.

Mother's participation in court-ordered services during the ensuing months was unsuccessful. Although Mother participated in supervised visits with M.M., Mother never progressed to unsupervised visits. Mother also did not successfully complete home-based services or individual and family counseling. In addition, Mother steadfastly refused to believe M.M.'s allegations against Stepfather.

---

[1] Stepfather was charged with two counts of child molesting as Class A and Class C felonies in January 2010. The State ultimately moved to dismiss the charges against Stepfather, without prejudice. The motion to dismiss was granted in December 2010.

[2] It was determined that M.M.'s older brothers would be allowed to remain in the home as there were no allegations of molestation involving the boys. Additionally, the boys were interviewed at their high school the following day and reported that Stepfather had "never touched them or tried to touch them." Appellee's App. p. 2.

[3] Mother appealed the trial court's CHINS determination, but the matter was affirmed in December 2010 by another panel of this Court in a Memorandum Decision. *See In re M.M.*, No. 85A02-1006-JC-776 (Ind. Ct. App. Dec. 29, 2010).

In March 2011, WCDCS filed its first petition seeking the involuntary termination of Mother's parental rights to M.M. due to her lack of progress in services. WCDCS later moved to dismiss the petition in May 2011 after Stepfather moved out of the family home and filed for divorce. During this time, Mother attended a family counseling session with M.M. and licensed social worker Ed Pereira. For the first time since the child's removal from her care, Mother listened to M.M. recount the details of her abuse and acknowledged, in the presence of Pereira, that she believed M.M. had been abused by Stepfather. Mother also verbalized that she wanted to reunite with M.M.

Within one month, however, Mother reunited with Stepfather and denied having ever believed or acknowledged M.M.'s stories of abuse. Mother's participation in home-based services and individual counseling also began to wane. Consequently, in late-June 2011, WCDCS filed a new petition seeking the involuntary termination of Mother's parental rights to M.M.

An evidentiary hearing on the termination petition was held in March 2012. During the termination hearing, WCDCS presented significant evidence establishing that Mother remained incapable of providing M.M. with a safe and stable home environment. WCDCS also introduced evidence showing Mother had failed to successfully complete home-based services as well as individual and family counseling and never progressed past supervised visits with M.M. Mother also continued to deny that she had ever believed or acknowledged M.M.'s allegations of abuse by Stepfather.

At the conclusion of the termination hearing, the trial court took the matter under advisement. The next day, the trial court entered its judgment terminating Mother's parental rights to M.M. Mother now appeals.

**Discussion and Decision**

When reviewing termination-of-parental-rights cases, we neither reweigh the evidence nor judge witness credibility. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's parental rights, the trial court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*,

5

666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur in Indiana, the State is required to allege and prove, among other things:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[4] "The State's burden of proof in termination of parental rights cases is one of 'clear and convincing evidence.'" *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2). If the trial court finds that the

---

[4] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). Mother only challenges the sufficiency of the evidence supporting the trial court's conclusions as to subsections (b)(2)(B) of the termination statute cited above. *See* I.C. § 31-35-2-4(b)(2).

Mother complains that the evidence presented during the termination hearing establishes that WCDCS required Mother to acknowledge M.M.'s allegations of abuse by Stepfather to be true before reunification of the family was possible. Mother therefore contends she was "doomed to legal failure because of the precondition of belief in something that she so clearly found to be unbelievable." Appellant's Br. p. 7. Mother therefore claims she is entitled to reversal.

Initially, we observe that Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find that only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Here, the trial court determined that subsection (b)(2)(B)(i) was established by clear and convincing evidence, namely, that there is a reasonable probability the conditions leading to M.M.'s removal would likely not be remedied. In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The trial court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.*

7

Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. Moreover, a county department of child services is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). Finally, we have previously explained that Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

Here, the trial court made several pertinent findings regarding Mother's failure to benefit from reunification services and her continuing inability to provide M.M. with a safe and stable home environment. Specifically, the trial court found that although Mother had been "compliant with the supervised parenting," Mother had "not been fully compliant with home[-]based services and individual/family counseling" and her "participation in counseling fell off significantly following the filing of this second petition to terminate her parental rights." Appellant's App. p. 43. The court also found that Mother had "steadfastly denied" M.M.'s allegations against Stepfather, other than for a "brief period in March 2011," and "now denies" that she ever told M.M. she believed her during the underlying proceedings. *Id.*

There was conflicting testimony concerning whether a safety plan was ever presented as a means to achieve reunification despite Mother's ongoing relationship with Stepfather and refusal to believe M.M. However, the trial court specifically found that it believed Mother "clearly understood that, despite her denial that the molestation occurred, if reunification were to occur, [Stepfather] would not be allowed to have contact with the child." *Id.* at 44. The court further observed:

> [W]hether or not a specific safety plan (in which [Stepfather] was effectively out of the picture) was developed, is no defense to Mother. The first petition to terminate her parental rights was dismissed after she and [Stepfather] separated, a petition to dissolve their marriage was filed[,] and she told [WCDCS] she would seek a protective order against [Stepfather]. The Court does not believe Mother would have done anything other than what she has done (i.e. place her relationship with [Stepfather] above that with her child) even if a specific case plan to the contrary was in effect. Requiring a specific plan to be developed which would require Mother to do what, by her own actions, she has shown she is not willing to do, would have been useless. Ed Pereira's own concerns about Mother's credibility following her failure to divulge to him when she reunited with [Stepfather] support this conclusion as well.

*Id.* at 44-45. Based on these and other findings, the trial court concluded that there is a reasonable probability the conditions resulting in M.M.'s removal and continued placement outside Mother's care will not be remedied. A thorough review of the record reveals that these findings are supported by abundant evidence.

Testimony from WCDCS case managers and service providers makes clear that, at the time of the termination hearing, Mother's circumstances and ability to provide M.M. with a safe home environment remained unchanged. Since the time of M.M.'s removal, Mother failed to successfully complete virtually all of the court-ordered reunification services, including individual therapy, family therapy, and home-based services. In

9

recommending termination of Mother's parental rights, WCDCS case manager Natalie Presley testified during the termination hearing that although Mother was very consistent in visiting with M.M., the level of interaction between Mother and M.M. during visits remained at a "very surface level." Tr. p. 8. Home-based counselor Steve Hatland likewise confirmed that Mother never progressed past supervised visits with M.M during the two years the family was provided services. Mother, too, acknowledged during the termination hearing that her communications with M.M. had remained superficial.

Presley and Hatland also both confirmed that Mother's participation in home-based services became "sporadic" in July 2011 when Mother began "cancelling" and "no-showing [for] appointments" and that Mother's last home-based counseling session was in September 2011. *Id*. at 8, 25. As for individual counseling, Presley reported that Mother stopped attending sessions in April 2011, then "started again . . . a couple of months later" but her attendance was "very inconsistent." *Id.* at 9. Presley went on to explain that Mother had indicated she only returned to counseling "because her attorney told her to." *Id*. Similarly, Pereira confirmed that Mother's participation in individual counseling sessions became less frequent following the filing of the second termination petition, and by June 2011 Mother had "stopped being cooperative." *Id.* at 43. When asked why Mother stopped participating in individual counseling and home-based services, Mother answered, "I don't have a good reason for you." *Id.* at 105.

Finally, it was the general consensus of Presley, Pereira, M.M.'s therapist Deb Williams, and Court Appointed Special Advocate Joy Curless that Mother's ongoing relationship with Stepfather and refusal to believe that M.M. had been molested by

10

Stepfather posed a danger to the child's safety. Nevertheless, testimony from several witnesses, including Presley and Pereira, confirmed that with "appropriate diligence, and continued counseling," along with a safety plan that prohibited contact between Stepfather and M.M., reunification remained possible, but that Mother had refused to complete counseling. *Id.* at 60.

As previously explained, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Based on the foregoing, we conclude that WCDCS presented clear and convincing evidence to support the trial court's findings cited above, including its determination that there is a reasonable probability the conditions resulting in M.M.'s removal and continued placement outside Mother's care will not be remedied. These findings, in turn, support the court's ultimate decision to terminate Mother's parental rights to M.M. Mother's arguments to the contrary, including her complaints that WCDCS failed to adopt a formal safety plan due to Mother's refusal to acknowledge the abuse suffered by M.M., amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d at 264.

This Court will reverse a termination of parental rights "only upon a showing of 'clear error'– that which leaves us with a definite and firm conviction that a mistake has been made." *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting *Egly v.*

11

*Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

MATHIAS, J., and BARNES, J., concur.