762 N.E.2d 1244 (2002)
In re the Matter of the Involuntary Termination of the Parent-Child Relationship of A.F. and M.F., Minor Children, and their Father, Michael Faver, Sr., Appellant-Respondent,
v.
MARION COUNTY OFFICE OF FAMILY AND CHILDREN, Appellee-Petitioner, and
Child Advocates, Inc., Appellee-Guardian Ad Litem.
No. 49A02-0106-JV-418.
Court of Appeals of Indiana.
February 12, 2002.
*1246 Jan B. Berg, Indianapolis, IN, Attorney for Appellant.
Loretta A. Olesky, Child Advocates, Inc., Tammi Forster, Marion County Office of Family and Children, Indianapolis, IN, Attorneys for Appellees.

*1245 OPINION
MATHIAS, Judge.
Michael Faver ("Father") appeals the trial court's order terminating his parental rights to his now fifteen-year old daughter A.F. and eleven-year old son M.F. Father argues that the findings of fact utilized by the trial court were deficient and cannot support the trial court's termination of Father's parental rights, thereby mandating another trial.
We affirm.

Facts and Procedural History
The facts most favorable to the judgment reveal that in 1986, Father and Kathy Helmerson ("Mother") were living in Broward County, Florida, with Mother's daughter from a previous relationship, C.J. On July 14, 1986, Mother gave birth to their daughter, A.F. While living in Florida, C.J. and A.F. were removed from Mother and Father's custody and placed in foster care. In February 1989, Father and Mother had another daughter, L.F., and upon L.F. testing positive for cocaine at birth, she was also removed from Father and Mother's custody. At the age of six months, L.F. was adopted. Sometime after L.F.'s birth, Father and Mother moved to Evansville, Indiana, abandoning A.F. and C.J. in Broward County.
Although neither Father nor Mother notified Broward County authorities of their new residence, after conducting a diligent search in anticipation of future reunification with the children, Broward County authorities located Father and Mother in late 1989. Also in anticipation of reunification with the children, Broward County enlisted the services of the Vanderburgh County Office of Family and Children ("VCOFC") to assist it in monitoring Father's and Mother's compliance with court-ordered services, including counseling, parenting classes, and a substance abuse evaluation. On May 16, 1990, M.F. was born to Mother. Father and Mother separated shortly after M.F.'s birth, and M.F. lived with Mother. Because Father failed to participate in the court ordered services, Broward County officials awarded custody of C.J. and A.F. to Mother, and in January 1991, C.J. and A.F. were flown to Evansville where the three were reunited. VCOFC continued to monitor Mother until Broward County released wardship in December 1991.
*1247 Sometime after December 1991, C.J., A.F., and M.F. began living with Father. In February 1993, VCOFC received an anonymous tip that C.J. and M.F. had been molested. VCOFC conducted an investigation, which revealed that Mother could not be located and had abandoned the children. Because Father was not C.J.'s natural father, VCOFC removed C.J. from Father's custody, and she was eventually adopted.
In March 1993, VCOFC again investigated Father after learning that A.F. had been observed initiating sexual contact with M.F. Father entered into an informal adjustment, under which he was ordered to cooperate with services and was monitored by VCOFC in lieu of removal of the children. During this time, Father participated in family counseling with A.F., but was not amenable to change, blaming problems the children were having "on other people, never accepting responsibility himself." R. at 269. Father often missed therapy sessions and often failed to follow through with the Child Protective Services ("CPS") case manager. Id.
In July 1993, during the informal adjustment period, VCOFC received a report that Father had physically abused A.F. and M.F. The children had sustained injuries after being spanked by Father, and Father admitted to spanking them with a wooden cutting board. As a result, VCOFC filed a Child in Need of Services ("CHINS") petition, and the children were removed from Father's care and custody. Father was subsequently charged with and convicted of Battery, as a Class D felony because of the spanking.[1]
In November 1993, Father was ordered to participate in services prior to reunification with the children.[2] Father did not comply with the court ordered services and was ordered again to participate in January 1994. Father did not comply with the court ordered services, and was again ordered to participate in July 1994. In October 1995, following the Vanderburgh county court's July 1994 order, the court found Father to be in contempt for his lack of participation, and as a result, VCOFC subsequently filed a Petition to Involuntarily Terminate the Parent Child Relationship. In response to the Petition, Father relocated to Indianapolis, Indiana, and began to submit reports from service-providers, none of whom had contact with VCOFC. Contrary to the advice of A.F.'s therapist, the Vanderburgh court placed the children back in Father's Marion County home in August 1996, and released wardship in November 1996.
In March 1999, after A.F. and M.F. had repeatedly run away and Father had refused to retrieve them and bring them home on several different occasions, Marion County Office of Family and Children ("MCOFC") began to investigate Father, and entered into a service referral agreement[3] with Father whereby MCOFC agreed to monitor the family in lieu of removing the children from Father's custody. MCOFC began to conduct home-based counseling and observed father to be controlling, often placing blame on his children *1248 for family problems. The counseling was unsuccessful and the family remained in turmoil.
On August 17, 1999, MCOFC filed a CHINS Petition because the children again had run away, and Father had again refused to retrieve them. A.F. and M.F. were removed from Father's care and custody and were adjudicated children in need of services on September 24, 1999. On that date, Father was advised of his rights as a parent involved in a CHINS proceeding, which included a warning that the CHINS determination could lead to involuntary termination proceedings. On October 5, 1999, after conducting a dispositional hearing, and after Father had admitted the specific allegations in the CHINS petition, Father was ordered to participate in services, including completion of a drug and alcohol assessment, a parenting assessment, home-based counseling, and parenting classes. Following the dispositional hearing, both A.F. and M.F. were removed from Father's care and custody under a dispositional decree, and Father was ordered to visit with both of them.
In October 1999, Father's visits with A.F. were stopped upon the recommendation of A.F.'s therapist, and at A.F.'s request, although he did have an opportunity to see her at court proceedings. In June 2000, a visit was arranged between Father, A.F., and M.F. Both A.F. and M.F. refused to attend the visit. When the case manager phoned Father to discuss the children's refusal, he indicated that he had forgotten about the visit. R. at 137. Father stopped visiting the children completely in June 2000.
Father participated in the family therapy sessions with M.F. from November 1999 through April 2000. According to the testimony of Tina Flack ("Ms. Flack"), the family therapist from the Children's Bureau, these sessions failed to improve the relationship between M.F. and Father. Ms. Flack testified that M.F. "would get uncomfortable and shut down and refuse to talk." R. at 218. In response to M.F.'s detached behavior, Father would become frustrated, telling M.F. during one session, "[I]f you're not going to talk to me, then I'm going to leave. We have to make this work, if you're not willing to work or talk to me, then I'll just sign the papers and you won't be my son anymore." Id. Ms. Flack opined that this behavior was harmful to M.F.'s emotional well-being. Father chose to stop participating in the sessions, altogether, in April 2000.
Both children suffer from multiple physical and emotional problems. A.F. was diagnosed with oppositional-defiant disorder, post-traumatic stress disorder, and a thought disorder. She has disrupted placements due to verbal and physical aggression. M.F. has displayed verbal and physical aggression, and he displays a guarded personality and has difficulty expressing his feelings. M.F. also has a problem with encopresis, or difficulty releasing his bowels. Both A.F. and M.F. have stated repeatedly that they experienced abuse in the home of their father and do not wish to return. Since being removed from Father's care and being placed in foster care, A.F. has not attempted to run away, and M.F. has shown improvement in his behavior at home and at school.
The trial court conducted a bench trial, which commenced on January 22, 2001, and continued on February 23, 2001, and March 23, 2001. Following the trial, the court took the matter under advisement and scheduled an in camera interview with the children. After in camera interviews with the children, the trial court received proposed findings of fact and conclusions of law from all interested parties. The trial court adopted MCOFC's proposed *1249 findings verbatim and ordered Father's parental rights terminated on June 8, 2001. Father now appeals.

Discussion and Decision
Father first argues that because the trial court adopted MCOFC's findings of fact in their entirety and without revision, they were not the product of a disinterested mind, and therefore were improperly utilized to support the trial court's decision to terminate Father's parental rights. We disagree.
In Tri-City Plaza Bowl v. Estate of Glueck, this court made the following observation as to a trial court's verbatim adoption of proposed findings of fact:
When the trial judge signs the findings of fact and conclusions of law, they become the court's findings of fact and conclusions of law. The court is responsible for their correctness. These findings of fact and conclusions of law are not weakened because they are adopted verbatim. If the proposed findings of fact and conclusions of law did not state the facts as the trial court found them to be, it would not have adopted them as its own. TR. 52(C) encourages the trial court to request the parties to submit proposed findings of fact and conclusions of law. These findings will not be set aside unless clearly erroneous. [Internal citations omitted].
Tri-City Plaza Bowl v. Estate of Glueck, 422 N.E.2d 670, 674 (Ind.Ct.App.1981) (as cited by Nat'l Briquette Corp. v. State Bd. of Tax Com'rs, 604 N.E.2d 11, 13 (Ind.Ct. App.1992), trans. denied). More recently our supreme court addressed the trial court's wholesale adoption of findings of fact and conclusions of law stating that:
It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority for our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings.[4]
Wrinkles v. State, 749 N.E.2d at 1188 (quoting Prowell v. State, 741 N.E.2d 704, 708-09 (Ind.2001)). Therefore, the court's verbatim adoption of MCOFC's proposed findings and conclusions of law was not, in and of itself, improper. Pursuant to our holding in Tri-City, we now look to the circumstances surrounding termination of Father's parental rights to determine if the trial court's verbatim adoption of MCOFC's proposed findings of fact and conclusions of law was clearly erroneous.
This court has long had a highly deferential standard of review in cases concerning the termination of parental rights. Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when parents are unable or unwilling to meet their parental responsibilities. In re K.S., 750 *1250 N.E.2d 832, 836 (Ind.Ct.App.2001) (citing In re L.S., 717 N.E.2d 204, 208 (Ind.Ct. App.1999), trans. denied). Although a parent has a right to establish a home and raise his or her children, these rights are not absolute and must be subordinated to the children's interests when the children's emotional and physical development is threatened. In re T.F., 743 N.E.2d 766, 773 (Ind.Ct.App.2001), trans. denied. The trial court need not wait until the children are irreversibly harmed such that their physical, mental and social development is permanently impaired before terminating the parent-child relationship. Id. Because the ultimate purpose of the law is to protect the child, the parent-child relationship will give way when it is no longer in the child's interest to maintain this relationship. In re B.D.J., 728 N.E.2d 195, 200 (Ind.Ct.App.2000).
In deference to the trial court's unique position to assess the evidence, in reviewing termination proceedings on appeal, this court will not reweigh the evidence nor assess the credibility of the witnesses. In re L.S., 717 N.E.2d at 208. We consider only the evidence that supports the trial court's decision and the reasonable inferences drawn from that evidence, and will set aside the judgment terminating a parent-child relationship only if it is clearly erroneous. Id. "A finding is clearly erroneous when there are no facts or inferences drawn therefrom which support it." In re A.K., 755 N.E.2d 1090, 1095 (Ind.Ct.App.2001). If the evidence and inferences support the trial court's decision, we must affirm. In re L.S., 717 N.E.2d at 208.
To effect the involuntary termination of a parent-child relationship, MCOFC must establish that:
(A) one (1) of the following exists:
(i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
(ii) a court has entered a finding under IC XX-XX-XX-X.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made;
(iii) after July 1, 1999, the child has been removed from the parent and has been under the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months;
(B) there is a reasonable probability that:
(i) the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied; or
(ii) the continuation of the parent-child relationship poses a threat to the well-being of the child;
(C) termination is in the best interest of the child; and
(D) there is a satisfactory plan for the care and treatment of the child.
Ind.Code § 31-35-2-4(b)(2) (1998). MCOFC must establish these elements by clear and convincing evidence. Ind.Code § 31-34-12-2 (1998).
Father does not specify which statutory element of proof he believes MCOFC failed to satisfy. He merely argues that sixteen of the eighty-four findings "are deficient and the decision of the court cannot rest upon these incompetent findings," and that two of the eighty-four findings "are contradictory." Br. of Appellant *1251 at 12, 13.[5] Father also argues that the court's findings of fact and conclusions of law are not supported by the evidence. However, even if Father is correct that the court incorrectly based its decision to terminate his parental rights on deficient or contradictory findings, provided there exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal. S.M. v. Elkhart County Office of Family and Children, 706 N.E.2d 596, 598 (Ind.Ct.App. 1999) (citing Williams v. Rogier, 611 N.E.2d 189, 196 (Ind.App.Ct.1993), trans. denied).
In conducting our review of the trial court's specific findings of fact and conclusions of law, we first determine whether the evidence supports the findings, and second, whether the findings support the judgment. In re E.M., 581 N.E.2d 948, 951 (Ind.Ct.App.1991), trans. denied. Because findings of fact are not to be reviewed individually, we review them in their entirety to determine if they support the court's legal conclusions or if they constitute an abuse of discretion. See Williams, 611 N.E.2d at 196.
Indiana Code section 31-35-2-4(b)(2)(A)
As previously stated, in order to terminate the parent-child relationship, MCOFC was required to present clear and convincing evidence sufficient to satisfy its statutory burden pursuant to Indiana Code section 31-35-2-4(b)(2). There is no dispute that A.F. and M.F. have been removed from Father's custody for at least six months under a dispositional decree sufficient to satisfy Indiana Code section 31-35-2-4(b)(2)(A)(i). Therefore, MCOFC met its statutory burden under this section.
Indiana Code section 31-35-2-4(b)(2)(B)
MCOFC was also required to establish by convincing evidence that there was a reasonable probability that "the conditions that resulted in the [children's] removal or the reasons for placement outside the home of the parents [would] not be remedied." Ind.Code § 31-35-2-4(b)(2)(B); In re B.D.J., 728 N.E.2d at 200. We find that it did.
To determine whether there is a reasonable probability that the conditions will or will not be remedied, the trial court should judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration evidence of changed conditions. In re A.K., 755 N.E.2d at 1096 (citing J.K.C. v. Fountain County Dep't of Pub. Welfare, 470 N.E.2d 88, 92 (Ind.Ct.App.1984)).
The trial court must also evaluate the parent's habitual patterns of conduct. Such an evaluation assists in determining the probability of future neglect or deprivation of the child, as well as remedial possibilities. In re A.K., 755 N.E.2d at 1096; In re B.D.J., 728 N.E.2d at 201. Based on this rule, trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. In re D.G., 702 N.E.2d 777, 779 (Ind.Ct.App.1998) (citations omitted).
Here, the evidence reveals that concerns about Father's parenting ability began as early as 1986 while Father was residing in Broward County, Florida with Mother, A.F., and A.F.'s half-sister, C.J. While *1252 living in Broward County, A.F. and C.J. were removed from Father and Mother's custody by county officials. In 1989, another daughter, L.F., was removed from Father and Mother's custody after testing positive for cocaine at birth. Shortly after L.F.'s birth and removal from Father and Mother's custody, Father and Mother moved to Evansville, Indiana, abandoning A.F. and C.J. in Broward County. Father and Mother never notified Broward County officials of their new residence and forced Broward County authorities to find Father when the time came to initiate reunification proceedings with Father's own child.
In February 1993, C.J., and A.F., began living with Father as well as M.F. who was born to Father and Mother after moving to Evansville. VCOFC began to monitor Father after it learned that C.J. and M.F. had been molested. In March 1993, Father was again investigated after VCOFC learned that A.F. was initiating sexual contact with M.F. Father entered into an informal adjustment and participated in family counseling, but was not amenable to change, blaming all problems on the children. In June 1993, VCOFC learned that Father had physically abused A.F. and M.F. Father acknowledged spankings, and was eventually charged with and convicted of Battery, a Class D felony due to his conduct. Moreover, both A.F. and M.F. have repeatedly stated to county officials and counselors that they suffered abuse in Father's home and do not wish to return to him. R. at 135. Clearly, Father has a significant history of neglectful and abusive behavior towards both A.F. and M.F., which could easily have led the trial court to determine that there was a substantial probability of future neglect or deprivation of the children.
Additionally, in a similar context, we have held that evidence of a parent's prior involvement with the OFC, including the filing of previous CHINS petitions and previous termination proceedings, is admissible as proper character evidence and helpful in demonstrating negative habitual patterns of conduct to determine parental fitness and the best interests of the children. See In re D.G., 702 N.E.2d at 780; In re J.L.V., 667 N.E.2d 186, 191 (Ind.Ct. App.1996). According to the record before us on appeal, VCOFC filed the first Petition to Involuntarily Terminate the Parent-Child Relationship against Father in 1994. Although Father was able to submit evidence from Indianapolis service providers and ultimately avoid termination, this evidence demonstrates a habitual pattern of behavior that Father is unlikely to provide a satisfactory home environment for A.F. and M.F.
Finally, the trial court can properly consider the services offered by OFC to the parent and the parent's response to those services as evidence of whether conditions will be remedied. In re B.D.J., 728 N.E.2d at 201. A parent's failure to appear for assessments and court hearings reflects ambivalence, and the failure to attend parenting classes reflects an unwillingness to change existing conditions. Id.
Father has a chronic history of either failing to comply with court ordered services altogether, or in completing court ordered programs. After Father's and Mother's move to Evansville and separation, Broward County officials, with the assistance of VCOFC, awarded custody of C.J. and A.F. to Mother because Father failed to participate in the ordered parenting classes and drug evaluation. In March 1993, although Father began and participated in some of the family counseling sessions with A.F., he often missed sessions and failed to follow through with CPS. In November 1993, Father was again *1253 ordered to participate in services following his conviction for battery. After failing to comply with the November 1993 order and failing to comply again in January 1994 and July 1994, Father was held in contempt of court for his lack of participation. In June 2000, after A.F. and M.F. had been removed from Father's custody and placed in foster care, Father stopped complying with court ordered visitations with the children, and has not requested visitation with either A.F. or M.F. since that time. This chronic history of failing to participate in court ordered services reflects, at best, an extreme ambivalence on Father's part, and a severe unwillingness to modify his behavior so as to provide A.F. and M.F. with a safe and secure home life. In re B.D.J., 728 N.E.2d at 201. Based on this evidence we cannot say that trial court's decision to terminate Father's parental rights was clearly erroneous.
Indiana Code section 31-35-2-4(b)(2)(C)
MCOFC was also required to show that terminating Father's parental rights was in the best interests of the children. Ind.Code § 31-35-2-4 (1998). We are mindful that in determining what is in the best interests of the children, the trial court is required to look at the totality of the evidence. In re A.K., 755 N.E.2d at 1097. In doing so, the trial court must subordinate the interests of the parents to those of the children involved. Id. However, as previously mentioned, the trial court need not wait until the children are irreversibly influenced such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship. Id.
Both A.F. and M.F. suffer from multiple physical and emotional problems, which have improved greatly since being removed from Father's care. Since being placed in Foster care, A.F. has not attempted to run away, and M.F. seems to be reinvested in life. According to the testimony of Debbie Scott, Program Coordinator for the Mentor Foster Care Agency, M.F. now "has things he's looking forward to doing in the future.... He's very active in sports, basketball most recently.... His grades are still very good. His behavior at school has not been a problem since September of 2000 ... he's opening up and talking and realizes he does have feelings, and it's ok to have feelings and to be able to discuss them." R. at 143-44.
Moreover, both A.F. and M.F. have repeatedly indicated that they do not wish to return to their Father's home. This evidence combined with Father's failure to make any attempt to see either A.F. or M.F. since April 2000, consistent placement of his own needs and interests before his children's, and the testimony of numerous individuals that it is in A.F.'s and M.F.'s best interests to terminate Father's parental rights, clearly shows that termination is in A.F.'s and M.F.'s best interest. We therefore find that the trial court did not err in concluding that termination would be in the best interests of the children and that Father's rights should be terminated.[6]

Conclusion
In light of Father's habitual pattern of neglect and abusive behavior towards A.F. and M.F. and chronic history of failing to comply with court ordered services, we find that MCOFC proved by clear and *1254 convincing evidence that termination is in A.F.'s and M.F.'s best interest.
Affirmed.
RILEY, J., and VAIDIK, J., concur.
NOTES
[1] Father pled guilty and was sentenced to three years probation and sixty days house arrest. R. at 190.
[2] Father was ordered to attend anger management classes, parenting/nurturing classes, and individual counseling. R. at 181.
[3] According to the testimony of Paula Johnson, MCOFC Case Worker, a service referral agreement is an agreement between OFC and the parents in order to prevent the children from being removed. R. at 71. "They'll put in a service referral agreement and put in services for that family, to try to hold it together, so we don't have to take the children out of the home." Id.
[4] Although the supreme court did not prohibit the practice of wholesale adoption of findings of fact and conclusions of law, it indicated that the practice is not favored and should be utilized sparingly stating:

[w]hen this occurs, there is an inevitable erosion of the confidence of an appellate court that the findings reflect the considered judgment of the trial court. This is particularly true when the issues in the case turn less on the credibility of witnesses than on the inferences to be drawn from the facts and the legal effect of essentially unchallenged testimony.
Wrinkles v. State, 749 N.E.2d 1179, 1188 (Ind. 2001).
[5] Father argues that the Findings numbered 7, 8, 9, 10, 30, 31, 33, 39, 40, 42, 44, 55, 56, 59, 64, and 65 are deficient.

Father argues that Finding number 25 and Finding number 43 are contradictory. Br. of Appellant at 12-14.
[6] We also note that Indiana Code section 31-35-2-4(b)(2)(D) is satisfied in that MCOFC has a satisfactory plan for the care and treatment of both A.F. and M.F. According to the record before us on appeal, MCOFC has identified adoption plans for both A.F. and M.F. R. at. 91-92.