**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 28 2013, 10:45 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**NANCY A. MCCASLIN**
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE:

**SERGIO A. LOPEZ**
DCS Local Office in Elkhart County
Mishawaka, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE INVOLUNTARY )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF K.M. AND J.H., Jr., )
                                       )
K.M., Mother of K.M. and J.H., Jr., )
M.M., Father of K.M. and J.H. Sr., Father of )
J.H. Jr., )
                                       )
     Appellants-Respondents, )
                                       )
          vs. )     No. 20A04-1206-JT-334
                                       )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
                                       )
     Appellee-Petitioner. )
                                       )

APPEAL FROM THE ELKHART CIRCUIT COURT
The Honorable Terry C. Shewmaker, Judge
The Honorable Deborah A. Domine, Magistrate
Cause Nos. 20C01-1202-JT-3 & 20C01-1202-JT-4

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**VAIDIK, Judge**

## Case Summary

Ka.M. ("Mother") is the mother of K.M. and J.H., Jr., who have different fathers. Mother and both fathers appeal the involuntary termination of their parental rights to their respective children. Concluding that clear and convincing evidence supports the trial court's judgment, we affirm.

## Facts and Procedural History

Mother is the biological mother of K.M., born in April 2004, and J.H., Jr., ("Junior") born in July 2008. K.M.'s father is M.M. ("Father M.M."). Junior's father is J.H., Sr. ("Father J.H."). In February 2011, the local Elkhart County office of the Indiana Department of Child Services ("ECDCS") became involved with the family after receiving a report that methamphetamine was being manufactured in the home. Indiana State Police confirmed that the necessary precursors for methamphetamine manufacture were being stored in the basement of the home. An ECDCS caseworker traveled to the home to speak to the parents.

ECDCS learned that all three parents lived together in the home with then-six-year-old K.M., two-year-old Junior, and seventeen-year-old S.M.[1] Mother is currently married to Father M.M. but has been in a romantic relationship with Father J.H. for some

---

[1] S.M., who is also Father M.M.'s child, was adjudicated a child in need of services ("CHINS") because of ECDCS's interaction with the family, but she turned eighteen during these proceedings. For that reason, S.M. is not involved in this appeal.

time. When asked about the report, Mother and Father J.H. admitted using methamphetamine but denied making it. Mother and Father J.H. also admitted that they had a history of domestic violence and were in a physical altercation earlier that day in front of Junior. Mother had scratches on her neck and chest from the altercation. ECDCS also learned that Father J.H. had been arrested on two previous occasions for battering Mother. S.M. confirmed the domestic violence between Mother and Father J.H., and Father M.M. confirmed Mother and Father J.H.'s drug use. ECDCS also learned that Mother and Father J.H. did not work; Father M.M. worked full-time to support the family.

ECDCS took the children into emergency protective custody and filed petitions alleging that they were children in need of services ("CHINS"). Fact-finding hearings on the CHINS petitions were held in February and March 2011, and the children were adjudicated CHINS. In April, the trial court issued a dispositional order formally removing K.M. and Junior from their respective parents' care and custody and making them wards of ECDCS. *See* Appellant's App. p. 65-66, 230-31. The court's dispositional order directed all three parents to successfully complete several tasks and services designed to facilitate reunification with the children and address the parenting, substance-abuse and domestic-violence issues in the home.

Mother and Father J.H. were ordered to complete parenting and substance-abuse assessments, complete any services recommended as a result of those assessments, engage in domestic-violence services, submit to random drug and alcohol screens upon request, and pay child support. *Id.* at 66. Additionally, Mother was ordered to meet with

3

medical and psychiatric personnel and take all prescribed medications as directed. *Id.* Father M.M. was ordered to complete parenting and substance-abuse assessments, comply with any recommendations as a result of those assessments, submit to random drug and alcohol screens upon request, and pay child support. *Id.* at 231. The parents were allowed supervised visitation with their respective children.

K.M. and Junior had a number of health and behavioral issues at the time of their removal. Junior tested positive for methamphetamine, *see* Tr. p. 14, and had lice. He was later diagnosed with pneumonia. He also suffers from developmental delays. Both children needed extensive dental work—Junior, in particular, required sedation to have four teeth pulled and three crowns and two fillings placed. *Id.* at 82-83. K.M. acted out sexually at home and at school and ate her own feces. *Id.* at 127, 133-35. She disclosed that she had been sexually abused by Father J.H., a claim DCS later substantiated. *Id.* at 384. When authorities told the parents about K.M.'s allegations, all three parents denied that any abuse had occurred.

In June 2011, the court suspended Mother's visitation with the children due to sporadic attendance and concerns that Mother was secretly discussing the sexual-abuse allegations with K.M. and treating K.M. poorly during visits, which caused K.M. to act out and be ill after visits ended. *Id.* at 47. The children continued to have supervised visitation with their respective fathers, however.

At a permanency review hearing in January 2012, DCS reported that all three parents had failed to complete certain tasks and services ordered by the court. Specifically, Mother had stopped attending individual therapy and her domestic-violence

support group. *Id.* at 121-22. Father M.M. had not completed a required class about drug addiction. *Id.* at 122. Father J.H. had not been attending therapy or drug treatment. *Id.* No parent had paid child support. The trial court suspended both fathers' visitation and modified the children's permanency plans from reunification to adoption. At some point in early 2012, Father J.H. was incarcerated on a domestic-violence charge.

In February 2012, ECDCS filed petitions to terminate Mother's parental rights to the children. ECDCS also filed petitions to terminate Father J.H.'s rights to Junior and Father M.M.'s rights to K.M. Evidentiary hearings on the termination petitions were held in May and June 2012. During the termination hearings, ECDCS presented evidence establishing that the parents had failed to complete the services and tasks ordered by the court, and as a result, were incapable of providing K.M. and Junior with a safe and stable home environment.

In the approximately fifteen months since her children's removal, Mother had not completed therapy and was unsatisfactorily dismissed from her domestic-violence support group. She never paid child support as she was ordered to do. Mother also continued to deny that Father J.H. had sexually abused K.M., even though DCS had substantiated the allegation. Father J.H. had not completed his drug treatment or individual therapy, or paid child support. And there had been no treatment for Father J.H. related to the substantiated allegations of sexual abuse made by K.M. Father M.M. had not paid child support and refused to believe that K.M. had been sexually abused by Father J.H. Additionally, one of Father M.M.'s therapy goals and assessment recommendations had been to move out of the home he shared with Mother and Father

5

J.H. Even K.M. had asked Father M.M. to leave the family home. Though he had been asked to do this for more than a year, Father M.M. waited until one week before the evidentiary hearing to move out. A clinical psychologist who assessed Father M.M. testified that Father M.M. was dependent upon Mother. Family Case Manager Diana Hampton ("FCM Hampton") agreed and expressed her belief that Father M.M. would ultimately return to live with Mother, because he had done so in the past.

ECDCS also put forth evidence that the children were thriving since being placed in foster care. Junior was physically healthy and his communication skills had improved. He was engaging others and speaking in full sentences. K.M. was also physically healthy and happy in her foster home. She was doing well in school and learning to recognize boundaries and control her impulses through regular therapy.

At the conclusion of the termination hearing, the trial court took the matter under advisement. In June 2012, the trial court entered its judgment terminating each parent's rights to their respective children. The parties now appeal.

**Discussion and Decision**

The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). "Indeed[,] the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb Cnty. Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). Nevertheless, parental

6

rights are "not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *Id.* (citing *In re D.D.*, 804 N.E.2d 258, 264-65 (Ind. Ct. App. 2004), *trans. denied*). Thus, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *D.D.*, 804 N.E.2d at 265. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Here, the trial court made specific findings and conclusions in its termination order. When a trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*; *see also Bester*, 839 N.E.2d at 147. Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

In Indiana, before parental rights may be involuntarily terminated, the State is required to allege and prove, among other things:

(B)     that one (1) of the following is true:

7

> (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child; and
>
> (D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).[2]  In addition, the State has the burden of pleading and proving each element of Indiana Code section 31-35-2-4(b) by "'clear and convincing evidence'" before the trial court can involuntarily terminate parental rights.  *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009) (quoting Ind. Code § 31-37-14-2).  Mother and both fathers challenge the sufficiency of the evidence supporting the trial court's judgment as to subsections (B), (C), and (D) of the termination statute detailed above.  *See* Ind. Code § 31-35-2-4(b)(2)(B)-(D).

## I.  Termination Orders

The parents first argue that the trial court's findings of fact are erroneous because they are simply a recitation of the evidence presented and testimony given during the termination hearings.  "A court or an administrative agency does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z.  Rather, the trier of fact must find that what the witness testified to is the fact."  *In re T.J.F.*, 798 N.E.2d 867, 873

---

[2]  Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

(Ind. Ct. App. 2003). However, if there "exist at least some valid findings to support the trial court's conclusions, erroneous findings will not prove fatal." *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. And this Court reviews a termination court's findings as a whole—rather than individually—to determine whether they support the court's legal conclusions. *Id.*

The parents point out that certain findings of fact in the termination orders recite specific testimony given at the termination hearings. This is accurate. But the court's references to specific testimony are followed by findings that flow from the cited testimony. For example, on page ten of the termination order as to Junior, after summarizing witness testimony, the trial court concludes: "The testimony presented at the two days of hearings in this case supports the finding that the parents have never been able to provide the care that [Junior] needs in order to continue his healthy emotional and physical development." Appellant's App. p. 15. Thus, to the extent the trial court recited witness testimony in its findings of fact, it did so to identify the basis of those findings. And when viewed as a whole, the termination orders clearly identify the bases for terminating the parents' rights in this case. We find no error here.

## II. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires a trial court to find only one of the three elements of subsection (b)(2)(B) has been established by clear and convincing evidence before properly terminating parental rights. *See L.S.*, 717 N.E.2d at 209. Here, the trial court determined that subsection (b)(2)(B)(i) was established by clear and convincing evidence, that is to say that ECDCS proved by clear and convincing evidence

9

there is a reasonable probability the conditions resulting in K.M. and Junior's removal and/or continued placement outside of their respective parents' care will not be remedied. *See* I.C. § 31-35-2-4(b)(2)(B)(i).

In making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 511 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000). Similarly, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F.*, 762 N.E.2d at 1251. The trial court may also consider the services offered to the parent by a county office of the Indiana Department of Child Services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* at 1252. Finally, the language of Indiana's termination statute makes clear that "it is not just the basis for the initial removal of the child that may be considered for purposes of determining whether a parent's rights should be terminated, but also those bases resulting in the continued placement outside of the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

### A. Mother's Care

In determining that there is a reasonable probability that the conditions resulting in the children's removal and/or continued placement outside of Mother's care will not be

remedied, the trial court set forth the evidence regarding Mother's unresolved parenting issues and her inability to protect and care for K.M. and Junior. Dr. Jay Shetler, a clinical psychologist who assessed the parents, testified that he could not recommend reunification between Mother and the children because she had not completed the required services, including therapy, drug treatment, and domestic-violence support. Dr. Shetler stated that he was concerned about the "likelihood that patterns would continue and there'd be continued drug use, [an] unhealthy relationship between [Mother] and whoever she was with, [and] these same unhealthy patterns that led to the removal of the children would continue." Tr. p. 210.

Beth Floyd, a domestic-violence advocate who ran the domestic-violence support group Mother was required to attend, testified that Mother "never identif[ied] that she was a victim in any way." *Id.* at 257. Floyd explained that Mother thought she had done nothing wrong, and the "one thing that was consistent throughout was the blaming, always blaming the system, blaming the caseworker, blaming the courts, blaming her own children." *Id.* at 256. Floyd said that eventually she asked Mother to leave the group because she refused to take responsibility and she was alienating other group members. Floyd also said that she discussed K.M.'s sexual-abuse allegations with Mother, and Mother never acknowledged that K.M. might be telling the truth. *Id.* at 263.

K.M.'s therapist, Kristina Elsbury, recounted K.M.'s graphic sexual-abuse disclosures and testified that although K.M. was doing well in therapy, she was still in a fragile state. Elsbury testified that K.M. said she did not want to return to live with her parents. *Id.* at 307. When asked if the children should be returned home to the[ir]

11

biological parents, Elsbury answered "no," because "in my professional opinion, it wouldn't be safe for the children." *Id.* at 315-16.

FCM Hampton testified that Mother had refused to take responsibility for the children's removal and that "at no point did she ever stop blaming everybody else." *Id.* at 463. FCM Hampton testified that Mother had not completed her required therapy or drug treatment, and expressed concern about Mother's unemployment and continued "volatile" relationship with Father J.H. FCM Hampton also testified that when Mother learned that K.M. had accused Father J.H. of sexually abusing her, Mother accused K.M. of lying, which made FCM Hampton question Mother's ability to protect her children. *Id.* at 489. When asked whether she believed there was a reasonable probability that the conditions resulting in the children's removal would be remedied, FCM Hampton answered, "No," citing Mother's failure to complete the required services and concluding that Mother was "unwilling to meet the needs" of K.M. and Junior. *Id.* at 494-95.

A trial court must judge a parent's fitness to care for his or her children at the time of the termination hearing, taking into consideration the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the children. *D.D.*, 804 N.E.2d at 266. Where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-

child relationship. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003).

Throughout the underlying proceedings, Mother has refused to acknowledge the circumstances that led to her children's removal, choosing instead to make excuses and blame others. She has failed to take responsibility and the action necessary to show she is capable of refraining from engaging in abusive relationships and able to provide K.M. and Junior with the safe and stable home environment they need. Based on the foregoing, we conclude that that there is clear and convincing evidence to support the trial court's findings, as well as the court's ultimate determination that there is a reasonable probability that the conditions leading to the children's removal and continued placement outside of Mother's care will not be remedied. Mother's arguments to the contrary amount to an impermissible invitation to reweigh the evidence. *See D.D.*, 804 N.E.2d at 265.

### B. Father J.H.'s Care

The trial court also determined that there is a reasonable probability the conditions resulting in Junior's removal and/or continued placement outside of Father's care will not be remedied, and entered findings regarding Father J.H.'s unresolved parenting and substance-abuse issues, as well as his lack of progress in improving his ability to provide a safe and stable home environment for his son.

Dr. Shetler described Father J.H. as incapable of putting his son's needs before his own. Dr. Shetler testified that Father J.H. has a history of drug abuse and suicidal thoughts, and struggles with anger, boundary-setting, and has low motivation for

13

treatment. At the time of the termination hearings, Father was on work release, having recently been released from prison on a domestic-violence charge. FCM Hampton testified that Father J.H. failed to complete the services designed to help him with his parenting and substance-abuse issues; specifically, he failed to complete his individual therapy and drug treatment. Michelle Lipps, an investigator with DCS, also testified and explained that although K.M.'s allegations of sexual abuse by Father J.H. had been substantiated, Father J.H had not received any treatment related to this issue.

Like Mother, Father has failed to demonstrate that he is capable of providing Junior with the safe and stable home environment the child needs. Father has a violent criminal history and has battered Mother in Junior's presence. DCS has substantiated charges of sexual abuse against Father J.H., and Father J.H. has not received any treatment related to this issue. In addition to the domestic violence in the home, Junior was removed because of Mother and Father J.H.'s admitted drug use and concerns about methamphetamine manufacturing in the home. Two-year-old Junior tested positive for methamphetamine when he was removed from his parents' care. It is particularly troubling that despite this fact, Father J.H. has never completed drug treatment. We conclude that that there is clear and convincing evidence to support the trial court's findings and ultimate determination that there is a reasonable probability the conditions leading to Junior's removal and continued placement outside of Father J.H.'s care will not be remedied.

*C. Father M.M.'s Care*

14

In determining that there is a reasonable probability the conditions resulting in K.M.'s removal and/or continued placement outside of Father M.M.'s care will not be remedied, the trial court set forth the evidence regarding Father M.M.'s inability to provide a safe and stable home environment for K.M.

Dr. Shetler testified that Father M.M. has been a passive parent and has failed to act on his children's behalf. Dr. Shetler described Father M.M. as codependent on Mother and explained that Father M.M. failed to protect K.M. and his older daughter, S.M., from drug use in the family home. FCM Hampton explained that while Father M.M. had been the most compliant of the three parents, he had failed to pay child support even though he had a full-time job. FCM Hampton also explained that Dr. Shetler recommended that Father M.M move out of the home he shared with Mother and Father J.H. This was also one of Father M.M.'s therapy goals. And perhaps most tellingly, this was something Father's own child had asked him to do. Despite this, FCM Hampton said it took Father M.M. more than a year to do so—Father M.M. moved out of the family home only a week before the termination hearings. And FCM Hampton said she believed that he would return to live with Mother and Father J.H. because he had done so in the past. FCM Hampton also reiterated that Father M.M. had chosen not to believe his daughter, K.M., when she said she had been sexually abused by Father J.H. Instead, Father M.M. made excuses for Father J.H.

Father M.M. has failed to demonstrate that he is capable of providing K.M. with the safe and stable home environment she needs. While caseworkers testified that Father M.M. was more compliant than Mother and Father J.H., he nonetheless failed to do all

15

that was asked of him. Father M.M. failed to pay child support although he has been employed throughout these proceedings. And like Mother and Father J.H., he has prioritized his relationships with the adults in the family over the protection of his child. Father M.M. chose not to believe that K.M. was sexually abused by Father J.H. and made excuses for Father J.H. For more than a year, while his daughter was in foster care, he failed to remove himself from the volatile and abusive home he shared with Mother and Father J.H. despite repeated requests that he do so. Those knowledgeable about the family's history believe that Father M.M. will return to live with Mother and Father J.H. because he is codependent upon Mother and has done this in the past. The trial court was within its discretion to weigh Father M.M.'s recent move against testimony about his past behavior, dependence upon Mother, and passive nature, as well as testimony about K.M.'s very fragile state. Finally, although Father M.M. attempts to characterize his relationship with K.M. as trusting and loving, Appellant's Br. p. 25, this is contradicted by K.M.'s statements that she does not want to return to live with her parents.

We conclude that that there is clear and convincing evidence to support the trial court's findings and the court's ultimate determination that there is a reasonable probability the conditions leading to K.M.'s removal and continued placement outside of Father M.M.'s care will not be remedied.

### III.   Best Interests

We next consider the parents' assertion that ECDCS failed to prove that termination of their parental rights is in the children's best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors

16

identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In so doing, the trial court must subordinate the interests of the parent to those of the child. *Id.* A trial court need not wait until a child is irreversibly harmed such that his or her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id.* at 199.

The trial court made several additional pertinent findings and conclusions in determining that termination of the parents' rights is in the children's best interests. Specifically, the court found that Junior had made significant developmental improvements since being placed in foster care. Junior's foster mother testified that Junior needs structure, supervision, and regular health care. Citing the testimony given by those involved with Mother and Father J.H., the court concluded that Junior had not and would not receive these things from his parents. The trial court also explained that Mother and Father J.H. have failed to provide any financial support for their son since his removal from the home. Court-appointed special advocate ("CASA") Gena Weber and FCM Hampton also testified that they believed termination of Mother and Father J.H.'s rights to be in Junior's best interests. Tr. p. 499, 596.

The court also made specific findings about K.M.'s best interests. K.M.'s foster mother described K.M.'s progress at home and in school. K.M.'s foster mother explained that K.M. needs structure, supervision, and regular health care, among other things. Referring to the testimony from those involved with Mother and Father M.M., the court concluded that K.M. had not and would not receive these things from her parents. The court also noted the testimony of CASA Weber, who relayed K.M.'s statement that she

did not want to live with her parents again. Both CASA Weber and FCM Hampton testified that they believed termination of Mother and Father M.M.'s rights to be in K.M.'s best interests. *Id.*

Based on the totality of the evidence, including the cumulative unresolved parenting, domestic violence, and substance-abuse issues, coupled with the testimony from those involved in this case recommending termination of parental rights, we conclude that clear and convincing evidence supports the trial court's determination that termination of Mother, Father J.H., and Father M.M.'s parental rights to K.M. and Junior is in the children's best interests.

### IV. Satisfactory Plan

Finally, we consider the parents' claim that ECDCS failed to show by clear and convincing evidence that it had a satisfactory plan for the future care and treatment of the children. Indiana Code section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find that there is a satisfactory plan for the future care and treatment of the child. *D.D.*, 804 N.E.2d at 268. It is well established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *Id.* ECDCS's plan for the children is adoption. This plan provides the trial court with a general sense of the direction of the children's future care and treatment. ECDCS's plan is therefore satisfactory. *See id.* (concluding that the State's plan for child to be adopted by current foster parents or another family constitutes a suitable plan for future care of child). The parents' argument that ECDCS's plan is not appropriate is simply a repetition

18

of their arguments against termination, which we have rejected, and a recitation of the evidence favorable to them, and we do not reweigh evidence on appeal.

This Court will reverse a termination of parental rights "'only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made.'" *In re A.N.J.*, 690 N.E.2d at 722. We find no such error here.

Affirmed.

BAILEY, J., and BROWN, J., concur.