**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 19 2013, 6:27 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**ROBERTA L. RENBARGER**
Renbarger Law Firm
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**CHERRIE L.B. WELLS**
Fort Wayne, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION ) | |
| OF THE PARENT-CHILD RELATIONSHIP ) | |
| OF: I.M.A. and L.R.A. (Minor Children), and ) | |
| M.M.H. (Mother), ) | |
|     Appellant-Respondent, ) | |
| ) | |
|       vs. ) | No.  02A04-1212-JT-634 |
| ) | |
| THE INDIANA DEPARTMENT OF ) | |
| CHILD SERVICES, ) | |
|     Appellee-Petitioner. ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Charles F. Pratt, Judge
The Honorable Lori K. Morgan, Magistrate
Cause No. 02D08-1202-JT-43
Cause No. 02D08-1202-JT-44

**July 19, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BAILEY, Judge**

## Case Summary

M.M.H. ("Mother") appeals the termination court's order terminating her parental rights as to I.M.A. and L.R.A. ("Children").

We affirm.

## Issue

Mother raises two issues for our review, one of which we find dispositive and restate as: whether there was insufficient evidence to support the conclusion that continuing the parent-child relationship posed a threat to Children's well-being.

## Facts and Procedural History

I.M.A. was born to Mother in 2007; L.R.A. was born to Mother in 2009.[1] Each child was born premature and suffered upper respiratory difficulties during childhood. Mother suffered from Crohn's Disease and had been previously diagnosed with bipolar disorder and post-traumatic stress disorder ("PTSD"). I.M.A. was receiving treatment for hyperactivity. During the first six months of L.R.A.'s life, Mother brought the child to hospital emergency rooms for treatment approximately fifty times. After a visit to the hospital in March 2010, an emergency room physician contacted the Department of Child Services ("DCS") to report concerns about Mother's neglect of Children.

DCS contacted Mother, who agreed that I.M.A. and L.R.A. were Children in Need of Services ("CHINS"). Upon investigation of Mother's and the Children's circumstances, DCS also learned that Mother's relationship with Father involved domestic violence. As part

---

[1] The parental rights of Q.A. a/k/a P.M. ("Father") were also terminated; Father does not appeal.

2

of a safety plan to avoid removal of the Children from her home, Mother sought and obtained protective orders against Father as to herself and Children. DCS began to provide parenting and other home-based services for Mother. The court ordered Mother to obtain psychological health services for herself and designated a specific physician as a primary point of contact for the Children's medical care.

During the initial phases of the case, Mother and the Children resided with Mother's mother ("Grandmother"). Mother's relationship with Grandmother was volatile at times, and in July 2010 Mother moved with the Children to a trailer park that was relatively near Father's place of residence. After less than one month, however, Mother moved herself and the Children out of the mobile home and back into Grandmother's home.

Soon after this, on August 10, 2010, Mother was preparing a sleep aid for I.M.A. and left the medication out while she used the restroom. I.M.A. consumed an overdose amount of the prescription medication; consequently, DCS removed the Children from the home and placed them into foster care. After Children's removal from the home, Mother began to obtain psychological counseling services and to engage in supervised visitation with the Children.

After approximately one year, in August 2011, DCS returned the Children to Mother's home, which she still shared with Grandmother, for a trial home visit, with the expectation that the Children would be reunified with Mother. On November 17, 2011, a hearing was held, during which DCS requested a three-month extension of the trial home visit to enable Mother's continued access to services, including assistance locating independent housing for

3

herself and Children.

On November 18, 2011, Mother was arrested after driving a car used to transport an individual who committed a bank robbery. L.R.A. was in the car with Mother at the time. Mother was arrested and was in jail from November 18, 2011 until February 7, 2012, when she was released to a four-year term of home detention after pleading guilty to a charge of Aiding an Armed Robbery, as a Class C felony.

On November 22, 2011, shortly after Mother's arrest, a detention hearing was held, and the Children were again placed into foster care. The Children remained in foster care after Mother was released from prison and into home detention.

On February 21, 2012, a permanency hearing was held, at which DCS requested that Mother's parental rights be terminated.

On March 28, 2012, after requesting that a community corrections officer take her for psychiatric treatment, Mother was rearrested for violating the terms of her home detention sentence. Mother's home detention was subsequently revoked, and she was incarcerated in the Indiana Department of Correction.

In a hearing conducted on July 31, August 1, August 2, and August 16 2012, the termination court heard evidence relating to DCS's petition to termination Mother's parental rights. On November 14, 2012, the termination court entered findings and conclusions, in which it granted DCS's petition to termination Mother's parental rights.

This appeal ensued.

**Discussion and Decision**

Mother appeals the trial court's order terminating her parental rights. Our standard of review is highly deferential in cases concerning the termination of parental rights. In re K.S., 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). This Court will not set aside the trial court's judgment terminating a parent-child relationship unless it is clearly erroneous. In re A.A.C., 682 N.E.2d 542, 544 (Ind. Ct. App. 1997). When reviewing the sufficiency of the evidence to support a judgment of involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. Id. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. Id.

Parental rights are of a constitutional dimension, but the law provides for the termination of those rights when the parents are unable or unwilling to meet their parental responsibilities. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents, but to protect their children. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), trans. denied.

Indiana Code Section 31-35-2-4(b)(2) sets out the elements that the DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

(A) That one (1) of the following is true:

    (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    (ii)    A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

    (iii)    The child has been removed from the parent and has been under

5

the supervision of a county office of family and children for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) That one (1) of the following is true:

(i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii)   The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

If the court finds that the allegations in a petition described in Section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a). A trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re J.T., 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), trans. denied. The trial court also must "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." Id. Courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. A.F. v. Marion Cnty. Office of Family & Children, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), trans. denied.

In her appeal of the trial court's decision terminating her parental rights, Mother

6

argues that DCS did not provide sufficient evidence to satisfy the requirements of subsections 31-35-2-4(b)(2)(B)(i) and (ii). See supra. This statute "is written in the disjunctive" so that only one of the requirements of subsection (B)—here, either that there is a reasonable probability the conditions necessitating a child's removal will not be remedied or that continuation of the parent-child relationship poses a threat to the child's well-being— need be proved by clear and convincing evidence. In re L.S., 717 N.E.2d at 209.

The evidence presented to the termination court included testimony concerning Mother's mental health status and her decision-making skills. Before the CHINS proceedings began, Mother had already been diagnosed with Crohn's disease, bi-polar disorder, and PTSD. As a result of the rendering of services during the CHINS proceeding, Mother was also diagnosed with borderline personality disorder. Mother's therapist, Cynthia Probst ("Probst"), testified that borderline personality disorder caused Mother to make decisions that coincided with her own perceived interests to the detriment of the Children's needs. Probst also testified that Mother's decision-making was frequently impulsive, including the decision to leave I.M.A.'s sleeping medication accessible to him in August 2010, and that Mother compartmentalized her problems and refused to accept accountability for the effects upon the Children of her own decisions. Probst and other service providers further testified that Mother's arrest after aiding a bank robbery with L.R.A. in the car, together with Mother's subsequent failure to comply with the terms of her home detention or to participate regularly in DCS-provided services during that period, demonstrated that Mother's impulsiveness had not come under control. Thus, all the service providers opined

that maintaining the parent-child relationship between Mother and the Children would continue to expose the Children to the risks of Mother's impulsiveness.

In addition, numerous service providers, the Children's Guardian Ad Litem, and the Court-Appointed Special Advocate testified that Mother would present partial versions of facts to various service providers in order to get an answer she wanted on issues relating to her care of the Children or other matters. The Children's Guardian Ad Litem characterized this conduct "relentless" and driven by Mother's personality disorder. (Aug. 1, 2012 Tr. at 110.) Mother's triangulation among service providers extended to questions concerning the Children's medical care, and a safety plan was put into place that required Mother to contact a support system before taking the Children for medical care during the trial home visit from August to November 2011. Several service providers testified that Mother's decision-making abilities, even with successful completion of services, were likely insufficient to avoid harm to the Children without DCS-provided services in place for an extended period of time, and all of the providers testified that the safety plan's decision-making support system could not function in the long-term without DCS supervision.

In summary, all the service providers involved in the case testified that Mother's progress throughout the case was like a "roller coaster[,]" moving from one crisis to the next without permanent improvement. (Aug. 1, 2012 Tr. at 89.) Mother's decision-making abilities, which had placed the Children in jeopardy on prior occasions, had not improved after nearly two years of DCS-provided services, and service providers testified that continued services were unlikely to create subsequent improvement. Based upon this

8

evidence, we conclude that there was sufficient evidence that continuation of the parent-child relationship posed a threat to the Children's well-being under subsection 31-35-2-4(b)(2)(B)(ii).  Thus, we need not consider Mother's argument under subsection 31-35-2-4(b)(2)(B)(i), and affirm the trial court's order terminating Mother's parental rights.

Affirmed.

NAJAM, J., and BARNES, J., concur.