# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 22 2018, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re Termination of the Parent-Child Relationship of:

I.C. & J.C., Jr. (Minor Children)

and

J.C. (Father)

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Plaintiff*

May 22, 2018

Court of Appeals Case No.
82A05-1712-JT-3008

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge

The Honorable Renee A. Ferguson, Magistrate

Trial Court Cause No.
82D04-1704-JT-733 and 82D04-1704-JT-734

**Altice, Judge.**

## Case Summary

[1] J.C. (Father) appeals following the termination of his parental rights to I.C. and J.C., Jr., (J.J.)[1] (collectively, the Children). On appeal, Father argues that the evidence is insufficient to support the termination of his rights.

[2] We affirm.

## Facts & Procedural History

[3] Father and I.D. (Mother) have two children together: J.J., born February 24, 2013, and I.C., born March 20, 2016. Shortly after I.C.'s birth, the Department of Child Services (DCS) received a report that Father was acting aggressively toward hospital staff and yelling at his family. It was also reported that Father "slammed" J.J. head first into a bed. *Transcript* at 23. Father admitted that he had used marijuana, which was confirmed by a drug screen. The drug screen also returned a positive result for methamphetamine, although Father denied having used such.

[4] Father, who was twenty-one years old when DCS became involved, admitted to a family case manager (FCM) that he had been addicted to methamphetamine while he was living in California when he was eighteen years old. Father stated that his marijuana use began when he was "very young" and that he did not consider marijuana use to be a problem. *Id.* at 152. Father also admitted to

---

[1] J.C., Jr., is often referred to as J.J. in the Transcript and Exhibits.

"serv[ing] a jail sentence in California" for dealing marijuana and indicated that "if he crossed the state line again, he could serve up to 15 years in prison." *Exhibits Vol. I* at 147.

[5] On March 23, 2016, DCS filed petitions alleging that each child was a child in need of services (CHINS). During a May 17, 2016 hearing on the CHINS petition, Father denied the CHINS allegations, yet stipulated to the intake officer's report of preliminary inquiry as evidence in the case. Based thereon, the court adjudicated the Children to be CHINS. On June 14, 2016, the court held a dispositional hearing and ordered Father to participate in services, including a parenting aid program, nurturing classes, random drug screens, a substance abuse evaluation and all recommendations, a parenting assessment, and supervised visitation. Father was also ordered to remain drug and alcohol free, sign all releases necessary to monitor his progress, keep all appointments, and keep DCS informed as to his housing and employment status.

[6] DCS did not initially remove the Children, but Father's access to them was restricted due to his positive drug screen. During the first several months, Father did not visit with the Children. On July 1, 2016, DCS filed a verified information for contempt alleging that Father had not visited the Children, had not submitted to drug screens, and failed to "schedule, attend, complete or participate in anything" ordered by the court. *Id*. at 14. Father failed to appear for the contempt hearing, resulting in the issuance of a "no bond writ." *Exhibits Volume II* at 58. On or about August 8, 2016, DCS removed the Children from Mother's home and placed them in foster care after learning that Father was

residing with Mother and the Children.  Father was arrested on the writ.  Father was released the following day when the court approved the Children's removal from the home.  At a subsequent hearing, Father admitted the contempt allegations and the court took under advisement a sentence of ninety days in community corrections.

[7]     Throughout the course of the CHINS proceedings, Father was "pretty noncompliant" with the services offered.  *Transcript* at 115.  FCM Kristi Vest testified that Father did not agree with any of the services and never admitted that he had a problem or that he could improve in any area that services were being offered.  From the beginning, DCS had issues getting in touch with Father—either his phone was shut off or he did not have a working number— and he was "frequently" not where he stated he was going to be.  *Id*. at 130.

[8]     With regard to services, Father admitted that he "lacked" in keeping appointments, a sentiment that was repeated by service providers.  *Id*. at 32.  Father completed the court-ordered substance abuse evaluation and attended "some of the appointments" that were recommended, but soon "lost track" and stopped attending altogether.  *Id*. at 28.  Father did not complete any substance abuse treatment.  He also did not participate in the court-ordered nurturing classes because he did not believe that such requirement applied to him.  After missing several appointments and failing to meet with the therapist, Father eventually completed a parenting assessment with Ireland Home Based Services (Ireland).  Father, however, did not make any effort to follow the recommendations for improving his parenting skills.  Father submitted to less

than half of the requested drug screens between March 2016 and the start of the termination proceedings. Of the drugs screens to which he submitted, Father consistently tested positive for alcohol and THC. Although permitted to participate in supervised visitation with the Children, Father did not visit them from March through the early part of August 2016.

[9] In August 2016, Abby Smithhart, a home-based case worker with Ireland, was assigned to supervise Father's visits with the Children. Initially, supervised visits were scheduled for three times a week[2] and occurred at Mother's home. During the visits, Smithhart had to give "multiple warnings" because Father was not following the visitation rules in that he would argue with Mother in front of the Children and use expletive language. *Id.* at 79. She also noted that Father had a "short fuse" when dealing with J.J. and Mother. *Id.* at 91. Smithhart expressed concern with Father's discipline techniques, finding them to be "more harsh" than appropriate for a three-year-old child. *Id.* at 91. FCM Vest attempted to attend the supervised visits to observe Father's interactions with the Children, but Father became confrontational and aggressive towards her to the point where she stopped going. According to FCM Vest, Father's parenting never improved throughout the course of provided services.

[10] With regard to the supervised visits, Smithhart estimated that Father stayed for an entire visit one out of every four times. More often than not, Father would

---

[2] In November, the visits decreased to twice a week pursuant to a state mandate.

either take the dog for a walk, go upstairs to sleep, or take a smoke break during the time allotted for supervised visits with the Children. At some point, after several instances where Father either failed to be present or was unprepared for the visit, Father was placed on a two-hour call ahead. After the call ahead restriction was imposed, Father missed about half of his scheduled visits with the Children. Even with the call-ahead restriction, Father would sometimes confirm the visit but then cancel after the Children had arrived. Father's attendance did not improve after visits were reduced to once a week.

[11] Smithhart acknowledged that J.J. has a strong bond with Father and noted that he would cry if Father would not show for a visit. An incident occurred after one missed visit, when J.J. returned to his foster home and urinated behind a couch. After numerous missed visits, J.J. "c[a]me up with his own narrative of what … happened to his family," stating to Smithhart that he "believes his parents are dead." *Id*. at 860. Father's last visit with the Children was in November 2016.

[12] Kevin Schiff works at Ireland and was assigned as Father's home-based case worker. Father's goals were to find employment, obtain suitable housing, and improve his parenting skills. Schiff found Father to be "cooperative" and noted that he would "do what he asked of him." *Id*. at 76. Father, however, attended only nine of twenty-one scheduled appointments. Schiff helped Father obtain a social security card. With regard to employment, Father had some short-term jobs, but never obtained long-term employment. As to housing, Schiff believed that Father was living in an apartment with other people, but had "no proof"

whether it was Father's apartment. *Id.* at 71. Schiff acknowledged that Father had made some improvements in that he had obtained some short-term employment, but noted that there were no long-term improvements. Schiff also stated that Father failed to make any improvements to his overall stability.

[13] At a review hearing, the juvenile court imposed thirty days of the ninety-day contempt sentence due to Father's continued failure to participate in services. Father was in jail from November 28 to December 28, 2016. After his release, Father submitted to a drug screen, which turned out to be his only clean screen during his involvement with DCS. Father has had no visits with the Children since his release.

[14] On February 14, 2017, Father was driving with Mother and the Children's maternal grandmother when he lost control of the vehicle, hit a guardrail, and the grandmother was ejected from the car. Father fled the scene and the grandmother died. Father was arrested later that day and has since remained in jail. The State charged Father with Level 5 felony leaving the scene of an accident resulting in death and misdemeanor operating a vehicle without ever obtaining a license. On July 7, 2017, two days after the start of the termination fact-finding hearing, the criminal court accepted Father's guilty plea and noted that Father "has recently violated community corrections and is a fugitive from the State of California." *Exhibits Volume IV* at 22. Father was sentenced to 4 years at the Department of Correction with credit for 143 days.

[15] On April 25, 2017, DCS filed its petitions to terminate Father's parental rights to the Children.[3] The court held an initial hearing in the termination proceedings and appointed counsel for Father. On July 5, August 7, and September 1, 2017, the court held a termination fact-finding hearing. At the time of the September 1, 2017 hearing, Father was incarcerated at the Westville Correctional Facility.

[16] On November 22, 2017, the court entered its order terminating Father's parental rights to the Children. On November 28, 2017, the court held a hearing to announce its ruling and, upon Father's request, appointed counsel to represent Father on appeal. Father now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[17] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous.

---

[3] DCS also filed petitions to terminate Mother's parental rights. The court has since ordered that Mother's parental rights to the Children be terminated. Mother does not participate in this appeal.

*In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id*.

[18] The trial court entered findings in its order terminating Father's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id*.

[19] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[20] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D).

[21] Father first challenges the court's conclusions that there is a reasonable probability that the conditions that resulted in removal of the Children will not be remedied and that continuation of the parent-child relationship poses a threat to the well-being of the Children. DCS, however, needed to prove that only one of these circumstances was true. *See* I.C. § 31-35-2-4(b)(2)(B).

[22] With respect to the former, Father argues that DCS failed to prove that his release from incarceration and his asserted separation from Mother would not remedy the cause for removal of the Children. Father points to his testimony that upon his release from incarceration, he has a job "lined up" and he plans to live with his parents "for a couple weeks" until he earns enough to secure his own housing. *Transcript* at 37. Father also testified that he has been drug free since his incarceration and he intends to remain drug free upon his release. Father blames his sporadic participation in services, including his failure to consistently visit with the Children, on his relationship with Mother. He testified that he has made significant changes in his life since his most-recent incarceration and that the termination of his relationship with Mother will allow him to focus on the Children. Father does not provide an expected release date, but testified that he is working on his GED and hopes to participate in another program, both of which could result in reduction of his sentence. Father requests a second chance that includes additional time to complete services once he is released from incarceration.

[23] In making a determination in this regard, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child(ren). *Id.* In conducting this inquiry, courts may consider evidence of a parent's prior criminal history,

drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

[24] The court made extensive findings regarding Father's drug and alcohol abuse, failure to complete services, failure to maintain adequate housing and employment, and failure to consistently visit Children. Indeed, the court found that Father did not consistently attend visits with the Children and had not visited the Children after his release from jail in December 2016. Father submitted to only a fraction of the requested drug screens and of those to which he did submit, all save one were positive for drug or alcohol use. Father cooperated with only one service provider and acted aggressively toward others. Father did not maintain suitable employment or housing and it was often difficult for service providers to locate him. At the time of the final termination hearing, Father was incarcerated, serving a four-year sentence for leaving the scene of an accident that resulted in death and for driving without a license. While the court may have been a little heavy-handed in stating that Father "did not participate with a single service the Court put in place to remedy the causes for removal," the record clearly evinces that Father's participation in services was woefully lacking in every area and that he had made no long-term improvements. *Appellant's Appendix* at 32.

[25] Father's argument to the contrary is simply a request for this court to reweigh the evidence and judge the credibility of witnesses by giving more weight to his testimony about why he believes he deserves another chance. The trial court,

however, specifically found that Father's testimony was "completely unreliable." *Id*. We will not second-guess the court's assessment in this regard. To the extent Father argues that DCS did not present any evidence to refute Father's testimony, we disagree. The evidence of Father's habitual patterns of conduct and his failure to make any significant, long-term improvement throughout the course of the CHINS and termination proceedings outweighs Father's claims at the eleventh hour that he has changed.

[26] The reasons for removal of the Children were Father's drug use, criminal behavior, and violent behavior. The evidence presented by DCS clearly supports the court's findings and conclusion that there is a reasonable probability that the conditions that resulted in removal of the Children will not be remedied.

[27] Father also challenges the court's conclusion that termination is in the best interests of the Children. Again, Father's arguments amount to mere requests to reweigh the evidence and judge the credibility of the witnesses. Here, as noted by the court, DCS presented evidence that the Children are "strongly bonded" with their foster parents and are "thriving" in their care. *Appellant's Appendix* at 33. Further, the family case manager and other service providers testified that they believed termination was in the Children's best interests. *See In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009) ("the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that

termination is in the child's best interests").  DCS sufficiently established that termination was in the Children's best interests.

Judgment Affirmed.

Najam, J. and Robb, J., concur.